# No. 22-2750

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

BORIS KOTLYARSKY, an individual,

*Plaintiff-Appellant,*

-against-

UNITED STATES DEPARTMENT OF JUSTICE, a Governmental Federal Agency, PREET BHARARA, in his official capacity, JAMES COMEY, in his official capacity,

*Defendants-Appellees.*

*On Appeal from the September 30, 2022 Order of the*

*United States District Court for the Southern District of New York*

*District Court Case No.: 1:20-cv-09230-PGG-SDA*

---

**APPENDIX -REPLY**

---

Boris Kotlyarsky
*Pro Se*
1900 East 22nd Street
Brooklyn, New York 11229
917-969-9984

# **TABLE OF CONTENTS**

CORRESPONDENCES WITH JUDGE LEWIS A. KAPLAN……………………...1

NEWS ARTICLE VICTIM INTERVIEW "FEDS SOLD ME OUT"……………..6

TRANSCRIPT OF FBI RECORDED CONVERSATION BETWEEN NAYFELD AND KOTLYARSKY DATED MAY 13, 2016……………………………………8

ARRESTING OFFICERS FBI AND NYPD LUKE HARDISON AND GENNADY LADYZHINSKY……………………………………………………………......9

ADVICE OF RIGHTS SIGNED BY FBI AND NYPD……………………………11

POST ARREST INTERVIEW TRANSCRIPT ……………………………………12

POTIK COMPLAINT MURDER FOR HIRE ……………………………………23

POTIK COMPLAINT DISMISSAL……………………………………………...26

NOLLE PROSEQUII…………………………………………………………….28

POTIK OFFERED WEAPONS FOR SALE……………………………………..31

MARCH 22ND, 2016 ARRAIGNMENT…………………………………………32

JUNE 2ND, 2016 CONFERENCE………………………………………………34

NEWS ARTICLES………………………………………………………………36

OLEG MITNIK TESTIMONY THAT THERE WAS NO FINANCIAL GAIN FOR MY KOTLYARSKY……………………………………………...............45

NAYFELD TESTIMONY THAT THERE WAS NO FINANCIAL GAIN FOR MR. KOTLYARSKY……………………………………………..…...........65

EVIDENCE OF BORIS KOTLYARSKY'S INNOCENSCE…………………… 97

000001

16-CR-215(LAK)

# MEMO ENDORSED

Copies Mailed by Chambers.
3/9/2022          AM

## United States District Court. Southern District of New York FILED

To: **Hon. Lewis A. Kaplan**
From: **the US Citizen Mr. Boris Kotlyarsky**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/9/22
MAR 08 2022

Thank you for your order 03/03/2022, but this Record is entirely
misinterpreted by the court. The main issue is to provide the names of
Co-Conspirator and the Victim as it was charged as offence committed
by Mr. Kotlyarsky. There is a solution to the issue.
Your court's response: Case 1:16-cr-00215-LAK.
Document # 63 filed on 06/06/2017.
Judgment Title Section 18 U.C.S. § 1951.

A. Nature of Offence: Conspiracy to Commit Extortion.
   A Conspiracy assumes more than one person to participate
   in it. ( Mr. Kotlyarsky and ???)
   But I am the **only one** participant in the charged conspiracy
   offence; There is nobody else! So it's cannot be qualified as
   conspiracy, until name of second Co-conspirator revealed!!!
   So there must exist at least one other Name! Does such a
   name exist at all? Not Boris Nayfeld! (01/08/2016;
   01/11/2016; 10/01/2016; 10/12/2016 !!!– evidence).
   To sentence Mr. Kotlyarsky the Court must be in possession
   of Co-Conspirator Name! Case 1:16-cr-00215 (LAK)
   **If such a name does not exist then the Offence is not
   legitimate** with one name only
   **The Court must provide the Co-Conspirator's name or
   dismiss the case. There is no other choice: either name
   or case dismissal. The Name!??**

B. The same Nature of an Extortion Offence:
In an Extortion Charge, **there must be a Victim** subjected to
**extortion!** According to and based on **evidence possessed by
this Court** (12/03/2015, 12/16/2015-0007; 01/04/2016-0016;
01/07/2016-21-22-23; 01/08/2016; 01/09/2016-025; 01/11/2016!

1 | P a g e

5/6; 12/03/2017; 12/14/2017 declaration to Court; 03/18/2018N.Y.
Post Interview by Mr. Mitnik) - it's NOT Oleg Mitnik!!!

The Court **must provide the name of the Victim**!
**If the Victim does not exist then the offense is not legitimate
and the charge must be dismissed.**
I am sure that this Court never preside in the case where the
Government Witness and the Victim testified in support of
Innocence and Noble Deed of Defendant And not a single
evidence to support this offense (05/31/2017)
(in this case Mr. Kotlyarsky).
Looking for two names – the Co-Conspirator and the Victim.
If you Your Honor was not able to come up with these two names
Then I officially inform Your Honor that you have prosecuted and
sentenced the innocent US Citizen – Mr. Kotlyarsky – whose only
'crime' was saving the life of another US Citizen - Oleg Mitnink
And you Your Honor turned this Noble Deed into a federal crime.
You, **Your Honor, did sentence an innocent person -
Mr. Kotlyarsky – without single evidence to support your**
sentence.
Your Honor could have asked the Prosecutor Office of the
Southern District to help the court with these two names: the Co-
Conspirator and the Victim. You use power delegated to you
to decide without the need for any evidence at all.
You mentioned Russia in your sentence on 05/31/2017.
You copied the Russian roulette game and applied it to me: **to die
in prison or to plead guilty to a crime you never committed.**
Your Honor all that I wait from your court is **these two names:**
the Co-Conspirator and the Victim. Only God the Lord doesn't
make mistakes. You are not the God. If this was a mistake,
please **admit it and correct** it!
As stated in Torah: "If you saved Life of one person you saved the
World". Mr. Kotlyarsky did just that. God bless America.
With respect, Boris Kotlyarsky. 03/08/2022

000003

Memorandum Endorsement                    United States v. Kotlyarsky, 16-cr-215 (LAK)

        Lest it be forgotten, the defendant knowingly and voluntarily pleaded guilty to the offenses of conviction and entered into a plea agreement waived any right to appeal from or collaterally attack his conviction and sentence provided that the sentence was within the agreed range, as it indeed was. He nevertheless has litigated and lost a Section 2255 motion on the merits. The Court twice has advised him of the only avenue that even possibly might be open to him, an avenue that he has not pursued.

        There is no basis whatever for any action by the Court with respect to this corresopndence. Construing it as an application for some relief, it is denied. A certificate of appealability is denied, and the Court certifies that any appeal herefrom would not be taken in good faith within the meaning of 28 U.S.C. §1915(a)(3).

        Defendant is warned that any further baseless applications may result in the imposition of sanctions upon him.

        SO ORDERED.

Dated:      March 8, 2022

                                   Lewis A. Kaplan
                               United States District Judge

UNITED STATES DISTRICT COURT
CHAMBERS OF
LEWIS A. KAPLAN
UNITED STATES DISTRICT JUDGE
500 PEARL STREET
NEW YORK, NY 10007

Boris Kotlyarsky
1900 E 22nd Street
Brooklyn NY 11229

i12298i527 C019

### Letter of Apology by Mr. Kotlyarsky.

To: Honorable Lewis A Kaplan

**I would like to apologize to your honor for all my letters to your honor**. I would like to clarify some misunderstanding concerning my correspondence with your honor. My family and I immigrated to USA in December of 1979. Since 1979 I did not attend school or any college. I did work 12 to 14 hours every day to achieve our American dream. Therefore, I did not have any knowledge that these actions in violation of law. I beg your honor, who sentence me to 41 months, charging me with **18 U.S. Code § 1951** conspiracy to extort, count and extortion because my lack of knowledge. **Based on Google misleading information regarding conspiracy; where must be at least 2 persons. I DID ask** your honor repeatedly regarding of existence of the **second name that conspired with me!!** Also for **extortion according to Google** must be the victims and am I wrong to ask repeatedly for the existence of victim's name that I in fact extorted??? According to your honor, you charged me. I **would like to apologize for my stupid behavior. I did not know to sentence US citizen the court did** not need any evidence!!! It is more than enough to have your honor experience for 27 plus years I did **not know that asking these two names could be qualified as a crime.** Your honor taught me a lesson! This is my last letter of apology. I do not want to end up in prison, for asking these two stupid questions. Which could bring me back to prison? Yes, **I did spend 41 months in prison to save a life of US citizen Oleg Mitnik**. Therefore, **I do not want to end up in prison again for asking questions.** Hence, I have learned my lesson at my 74th year of age. **If it is possible, please forgive me.** Please,

000005

do not send innocent person to prison for second time just because you are a judge and have power. **First time saving life, by doing noble deed, second time for asking two questions.** To answer your honor, absolutely **correct to warn me in your 03/09/22 order; defendant is warned that any further base/ESS application may result in imposition sanctions upon Mr. Kotlyrsky so ordered Lewis A. Kaplan United States District Judge.** Your honor, **I am sincerely asking** you to forgive me. I thought that I Left Soviet Union behind me, but I was mistaken. In southern district Court also **was considered a crime to save a life of US Citizen Oleg Mitnik and if is not enough to start asking questions which is also considered a crime!!!!** That was the lesson I learned, never to do any noble deeds, never ask questions and then I will be saved and I will avoid prison time. **Unfortunately I did not know any of these. Please forgive me, it will not happen again.**

Sincerely,

Boris Kotlyarsky

God Bless America and In God We Trust.

23

New York Post, Sunday, March 18, 2018

nypost.com

# Terrified 'slay plot' mogul goes to court



HITS BACK: Shipping mogul Oleg Mitnik sued his father-in-law Anatoly Potik (inset), and wife Ronit (inset), after Potik allegedly hired Boris Nayfeld (right) to kill him.



# SCARY GEEZER 'HITMAN'

By KATHIANNE BONIELLO

Upper East Side shipping magnate Oleg Mitnik says she feels have sold him out by letting free two men accused of plotting his murder.

"The man who was supposed to kill me is out after 16 or 17 months, and the guy who ordered my murder, he's walking free. So that's justice," Mitnik told The Post.

"I am terrified."

So Mitnik is turning to a different venue in his search for justice — Manhattan Supreme Court.

He is suing his father-in-law Anatoly Potik, and his estranged wife, Ronit Mitnik, for $20 million for emotional distress and defamation.

The alleged murder-for-hire scheme unfolded amid Mitnik's bitter, ongoing divorce from Ronit, a socialite.

Mitnik says the aging Potik is one of the people who plotted his death. He identifies the other as Boris Nayfeld, 70, who he claims have long linked to the Russian mob.

Potik was arrested in January 2016 and charged with hiring Nayfeld to kill Mitnik. The price was $100,000.

If Potik's alleged plot had succeeded, his daughter would have benefitted from Oleg Mitnik's $7 million life-insurance policy. She also would have inherited their $9 million worth of real estate, including a Manhattan condo and a vacation home in Quogue, L.I., Oleg Mitnik alleges in his suit.

Mitnik says he thwarted the murder plan by calling the cops and offering Nayfeld $125,000 to call off the hit.

The feds picked up both men, but they eventually dropped their case against Potik, citing his deteriorating health.

Potik has a criminal history dating to 1985 and allegedly told Oleg Mitnik that he used murder to resolve business disputes in the past, according to the lawsuit.

"He's a very dangerous man. Somebody who smiles in your face and stabs you in the back," Oleg Mitnik said. "Every time I walk out of my building, I have to look left and right and take different exits and take different roads."

"They think I'm safe now and that he is not capable to do anything because it's in the public eye," said Mitnik, who has started carrying a gun.

Nayfeld — who admitted his role in the case — was freed on probation in October.

Nayfeld told The Associated Press in January that he would like to go back to Russia, and that the two years he spent locked up for plotting to kill Mitnik was punishment enough.

"I lost everything," Nayfeld told the AP. "I lost job, I lost my time for stay in prison. I lost my wife. This is enough punish for me."

But Mitnik doesn't buy it.

Mitnik believes his father-in-law, who he says has deep ties to the Russian and Italian mobs, was let off easy because he helped authorities investigate other crimes.

"They basically sold me out for cases, I think it sends the wrong message," Oleg Mitnik said of federal prosecutors.

Mitnik contends in court papers that his wife and her father have tarnished his name by spreading rumors that he framed Potik by cooking up false allegations of a

murder plot and by paying off federal agents.

"I think it will clear my name," Oleg Mitnik said of the civil lawsuit. "I think it's important for justice to be served at least at some angle."

Ronit Mitnik's lawyer, Robert Wallack, dismissed the allegations as "total fiction" and "utter garbage."

The murder plot was allegedly hatched after Potik testified in his daughter's divorce case, then flew to Moscow to meet with Nayfeld at the Azimut Olympic Hotel, says Mitnik's lawsuit.

Around the time Potik went to Russia, Ronit Mitnik forbade their daughter from riding in Oleg Mitnik's car, claiming a routine trip across Central Park to school was "too dangerous," the husband said in court papers.

Oleg Mitnik says Ronit Mitnik's claim that he had invented the murder plot has driven a rift between him and their two children — a 15-year-old son and 18-year-old daughter.

"I want peace for my family . . . I want to move on," he said.

000007

UNCLASSIFIED

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION



26 Federal Plaza, New York, NY 10278

File Number:                                    ████████████

Requesting Official(s) and Office(s):           SA Hardison, NYO C-24

Task Number(s) and Date Completed:              528644, 5/13/2016

Name and Office of Linguist(s):                 LA Ilona Desyatnik

Name and Office of Reviewer(s):                 Click here to enter text.

Source Language(s):                             Russian

Target Language:                                English

Source File Information
    Name of Audio File or CD:
    *If Applicable*—Call Number:
              —Date, Time, Duration: ████████████  ████████
              —Target Number:
              —Direction, Number:

VERBATIM TRANSLATION

**Participants:**
CHS       CHS                    BN        Boris Nayfeld
UM        Unknown Male

**Abbreviations:**
UI        Unintelligible         PH        Phonetic
OV        Voice overlap          SC        Simultaneous conversation
[ ]       Translator's exegesis  *Italics* English

UNCLASSIFIED

000008

UNCLASSIFIED
01/14/2016

Task # 528644

~~SA Hardison~~  This is Special Agent Luke Hardison. Today's date is Thursday, January the 14th, 2016. The time is approximately 1:40 PM. The following is a consensually recorded conversation between CHS and Boris Nayfeld, Boris Kotlyarskiy and persons yet unknown. I am handing the recording device to the CHS now.

[CHS driving] [Sound of heavy breath] [sound of cell phone message tone]

| | |
|---|---|
| 17:20 | [Sound of message] |
| 22:02 | [Sound of ringtone] |
| 25:10 | [CHS on the phone] |
| CHS: | *Uh huh. Uh huh, okay, but…okay, thank you.* |
| 26:00 | |
| CHS: | *I am going to be ten to fifteen minutes late, but I will be there. So, I don't know, I'm just letting you know. [Another voice on the phone, very low volume; UI] Thank you. I'm sorry.* |
| 31:40 | [Five spraying sounds] |
| 33:25 | |
| ~~CHS:~~ | *Hello, it's not good because the told me last time. Okay, I can call him but it's not going to be a good effect. I'm sure he is home. I don't know that, I'm not hiding anything. But I'm just telling you for sure, if I call him, it's going to set off ringing bells. I should have called him and asked him for the first time. I told him I'm going to be late. Ninety nine percent he is not going to come. He told me before. You heard it on tape. I introduced you. From now on I do not really care, he is not involved. I give you 99 percent he is home, 99.9. Okay, bye.* |
| 37:50 | [CHS exits from the car] |
| 40:10 | |
| UM | *Hi, how are you?* |
| CHS | *I'm just meeting somebody for a beer. No it's okay, not long.  What is today a holiday? Jesus Christ?* |
| UM | *It looks someone died.* |
| CHS | *Oh there is no parking.  I drove around the building.* |

1
UNCLASSIFIED

PO 0119

000009





FBI NEW YORK
JAN-14-16 5:21:09 P

**FD-395**
Revised
11-05-2002

**FEDERAL BUREAU OF INVESTIGATION**
## ADVICE OF RIGHTS

### LOCATION

Place: 26 Federal Plaza, Manhattan, NY     Date: 4/14/2016     Time: 4:23 pm

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

### CONSENT

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed: _[signature]_

### WITNESS

Witness: SA Luke B. Hardison _[signature]_

Witness: NYPD Det. _[illegible]_

Time: 4:23 pm

FD-395 (Revised 11-05-2002)          Page 1 of 1          FEDERAL BUREAU OF INVESTIGATION
                                                          BK 0013

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
2

3   ------------------------------x
                                   :
4   UNITED STATES OF AMERICA       :

5   v.                             :     S1 16 Cr. 215 (LAK)
                                   :
6   Boris Kotlyarsky               :
                                   :
7                                  :
    ------------------------------X
8

9                   Post-Arrest Interview
10
          Date: January 14, 2016
11        Time: 4:22 PM EST
          Participants:  BORIS KOTLYARSKY (BK)
12                       Special Agent LUKE HARDISON (LH)
                         GENNADY LADYZHINSKY (GL)
13

14
          Abbreviations: [UI] Unintelligible
15                       [IA] Inaudible

16

17

18

19

20

21

22

23

24

25

1    [Start at 4:59:56 PM EST]

2    LH:   For the… For either the information that Nayfeld

3          was sharing with Oleg, or for anything that

4          Nayfeld was with, do you have any idea whether

5          Nayfeld was being paid for that or whether Oleg

6          was going to pay him for that?

7    BK:   No, listen.. They didn't share for me - Nayfeld

8          wouldn't tell me if - I don't know - when we see

9          it -

10   [LH leaves room]

11   BK:   Why he should pay Nayfeld?  Potik's supposed to

12         pay Nayfeld if Nayfeld will the job.  Why Oleg

13         should pay Nayfeld?

14   GL:   [UI]

15   [LH enters the room]

16   LH:   Um, sorry.  Okay.  Uh, where were we?

17   BK:   Uh, why Oleg - if Oleg pay, uh, Nayfeld money.

18   LH:   You have no idea about that, right?

19   BK:   No, but tell me one thing.  I'm sorry.  Uh,

20         Potik, uh, if Potik, uh, ask Nayfeld, he should -

21         what for Oleg got to pay Nayfeld for?  If Oleg,

22         uh, uh, Nayfeld warned him what Potik want to do,

23         what has - why Oleg got to pay Nayfeld?

24   LH:   I don't know, I - you tell me.

25

```
 1    BK:   I cannot tell you because I weren't there and I

 2          don't want to -

 3    LH:   So certainly like when you made, when you made

 4          the introduction between Nayfeld and Oleg.

 5    BK:   Right.

 6    LH:   When you made that introduction, it wasn't in

 7          your mind that you thought that Nayfeld may

 8          charge Oleg for his help.  Is that right?

 9    BK:   He shouldn't charge because uh, how he could

10          charge Oleg if, uh, uh, he told Oleg information

11          about [UI] -  He didn't do no work, nothing.

12    LH:   Right.

13    BK:   Cause he just told Oleg that, uh, uh.  What they

14          do, uh, when they sit together -

15    LH:   Yeah.

16    BK:   They, uh, uh, Oleg give him information how bad

17          Potik is.  And Boris, uh, give information Oleg

18          how bad Potik is.

19    LH:   Right.

20    BK:   Because when Boris finished meeting with Oleg, he

21          said I didn't even couldn't imagine how Potik is

22          bad.

23    LH:   Yeah sorry, again, cause my question was, when,

24          at the outset of you, cause Oleg didn't know

25
```

```
 1              Boris Nayfeld until you.  You helped them know
 2              one another.  Right?
 3    BK:  I never -
 4    LH:  When you, when you introduced -
 5    BK:  You putting me in corner now.  I -
 6    LH:  No, no, no!  I'm not -
 7    BK:  I [UI] - I set it up.
 8    LH:  You set it up.  Okay whatever, I'm not - I'm not
 9              trying to.
10    BK:  Look, look.  Please, I'm innocent man!
11    LH:  Hey, one second, one second.  Let me finish and
12              then you can respond.  I definitely want to hear
13              your response.  All I'm saying is that when you
14              introduced the two of them, and, and it was
15              totally innocent, I get that.
16    BK:  Absolutely.
17    LH:  It was a totally innocent thing.
18    BK:  Absolutely.
19    LH:  But when you made that introduction, you
20              certainly didn't think in your mind that Nayfeld
21              would somehow wind up charging Oleg for this
22              information, right?
23    BK:  Never, never.
24    LH:  Okay.
25    BK:  Never.
```

1        LH:   Alright.

2        BK:   I don't think - until now - I don't think [UI].

3

4        [5:03:09 PM EST]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

000017



## Schukin Translation Service

68-61 Yellowstone Blvd. #109
Forest Hills, N.Y. 11375, USA

Telephone: 347-242-2558
E: schukintranslations@gmail.com

**STATE OF NEW YORK** )

**COUNTY OF** _Queens_ ) SS.:

# CERTIFICATION

THIS IS TO CERTIFY THAT THE ATTACHED AFFIDAVIT HAS BEEN WRITTEN AND SIGNED BY VALERII SCHUKIN ON JULY 21, 2016.

THE _21_ DAY OF _JULY_ 20_16_

**VALERII M. SCHUKIN,**
**RUSSIAN TRANSLATOR**

*Sworn to and subscribed before me*
*this the 21 day of July 2016*

Notary Public
Registered in the County of _Queens_

JACK B. GOLDHABER
Notary Public, State of New York
No. 01GO4976036
Qualified in Queens County
Commission Expires January 22, 20_19_

Innocent US Citizen - Boris Kotlyarsky
Saved The Life Of US Citizen - Oleg Mitnik!
No Financial or Any Gain For Boris Kotlyarsky
In Case I Wouldn't Make It!
A Cry From The Heart - Of Innocence!

| Page | | Video Post Arrest Statements! 01/14/2016 |
|---|---|---|
| 2 | BK | -Why don't you talk to Oleg Mitnik and he will tell you |
| 2 | BK | I have nothing to do at all, nothing!!! |
| 6 | BK | Suddenly Oleg called - 08/14/2015 |
| 7 | BK | He told me how bad divorce he has with his wife |
| 10 | BK | I didn't want to sit there (meeting) |
| 10 | BK | I don't want to know nothing! *PSR §15* |
| 12 | BK | I didn't arrange (The Meeting) |
| 14 | BK | Oleg (OM) wanted to see him |
| 14 | BK | I don't know, without me |
| 15 | BK | I have nothing like today, I have nothing |
| 16 | BK | All I need to tell Oleg that he should be careful |
| 16 | BK | I done my part |
| 17 | BK | I never participate. I never know about what *PSR §15.* |
| 17 | BK | They talking about, nothing, nothing, nothing! |
| 17 | BK | I didn't want it |
| 18 | BK | I don't know what they talking about, what they |
| 18 | BK | gonna talk. I did not! |
| 19 | BK | I have nothing to do at all! All I've done. |
| 19 | BK | I warn Oleg (OM) when I find out!! |
| 21 | BK | They didn't share with me |
| 22 | BK | I'm innocent man!! |
| 24 | BK | But what you accusing me? What did I do wrong? |
| 24 | BK | What did I do wrong? To tell Oleg (OM) |
| 24 | BK | I never said it. I would never. Give it to me! |

Page - 1

# A Cry Of Innocence!
## Innocent US Citizen - Boris Kotlyarsky

| Page | | Video Post Arrest Statements!  01/14/2016 |
|------|----|---|
| 24 | BK | I never did, I never, It was no conversation |
| 24 | BK | about the money.  It was no conversation. |
| 24 | BK | I know nothing about money.  I never could say. |
| 24 | BK | Give me...put me on a lie-detector. |
| 24 | BK | I never knew about the money! |
| 24/25 | BK | I said, go to you guys, the FBI and tape it |
| 25 | BK | I never said that, I never said |
| 26 | BK | To do what?!  To do what?! |
| 26 | BK | Look why Oleg didn't go to the FBI?  I told him! |
| 26 | BK | I advised him to go to the FBI! |
| 26 | BK | Who know what he gonna do?  If Anatoly wouldn't be |
| 26 | BK | arrested |
| 26/27 | BK | You said today.  I don't know if they meet, like |
| 27 | BK | I don't know if they meet, because maybe you |
| 27 | BK | **arrested them** before that |
| 27 | BK | All that my goal was.  Oleg has two children |
| 27 | BK | He is the nicest guy.  **I didn't want that Anatoly** |
| 27 | BK | **should hurt him.**  That is all. That's all that |
| 27 | BK | I'm involved with |
| 27 | BK | Do me a favor, please; Ask Oleg - How many |
| 27 | BK | times Boris suggested you to go to police and |
| 27 | BK | How many times I suggested to FBI.  Maybe, |
| 27 | BK | three, or four times, to go to you guys. |
| 27 | BK | I am not involved!  You can bring, you can |
| 27 | BK | make it.  I wasn't involved!  All what I want |
| 28 | BK | I wasn't involved.  Oleg was worried, |
| 28 | BK | He said, unbelievable, unbelievable |

Page - 2

## A Cry Of Innocence!
### If I Would Not Make It Through!


| Page |    | <u>Boris Kotlyarsky saved the life of US citizen - Oleg Mitnik</u> |
|------|----|-----|
| 28 | BK | <u>I'm normal innocent guy!</u> |
| 28 | BK | <u>Please let me, let me be at my home!</u> |
| 28 | BK | Except tennis <u>I do nothing,</u> I play tennis |
| 28 | BK | I live in my house, wherever let me do |
| 28 | BK | <u>I would cut my tongue out, that what</u> |
| 28 | Bk | <u>happend.  Why I called Oleg about what</u> |
| 28 | BK | <u>Anatoly was planning to do!</u> |
| 28 | BK | But I think I did a right thing.  If somebody |
| 28 | BK | want to hurt you, and you have two children |
| 28 | BK | Why, <u>I thought I did the right thing.  But</u> |
| 28 | BK | <u>now you telling me I shouldn't do this</u> |
| 28 | BK | <u>at all!</u>  But if I won't do.  I don't know. |
| 28 | BK | <u>I weren't involved in nothing,</u> Just wanted |
| 28 | BK | to find out that Anatoly to hurt his son-in-law |
| 28 | BK | and <u>I told his son-in-law, "Oleg, your</u> |
| 28 | BK | <u>father-in-law want to hurt you!"</u> |
| 28 | BK | <u>What wrong have I done?!</u> |
| 29 | BK | He (OM) is a nice hard working kid!  He is very |
| 29 | BK | nice kid, and when I heard that something |
| 29 | BK | bad somebody wanted to do to him something bad |
| 29 | BK | his father-in-law.  I told him, I would do |
| 29 | BK | this even to some stranger.  If somebody wanted |
| 29 | BK | to hurt this stranger.  I would tell, "watch out" |
| 29 | BK | <u>That's all I done!</u>  I told Oleg that his |
| 29 | BK | father-in-law had bad, don't forget, what |
| 29 | BK | Oleg was very afraid, why he meet with Nayfeld, |
| 29 | BK | because he was afraid that Nayfeld did not |
| 29 | BK | want to do it |

Page - 3

### A Cry Of Innocence!
### Innocent US Citizen - Boris Kotlyarsky

| Page | | Saved life of US Citizen - Oleg Mitnik |
|------|------|------|
| 29 | BK | But what stop Anatoly Potik to give |
| 29 | BK | somebody in Russia, When Oleg go to St. Petersburg |
| 29/30 | BK | or to Moscow?  Somebody will do something |
| 30 | BK | So Oleg meet Boris, Oleg asked him, if he |
| 30 | BK | know somebody in Russia that shouldn't |
| 30 | BK | happen to OLeg, that Potik shouldn't |
| 30 | BK | succeed that |
| 31 | BK | **Meeting on what?  To do what?** |
| 32 | BK | **No, No, meetings about money.  I knew nothing!** |
| 32 | BK | Meeting that guy (OM) want to know what Anatoly Potik |
| 32 | BK | was I set up the meeting that is all! |
| 32 | BK | Guys, **You can kill me, you can do whatever you want to me** |
| 32 | BK | I will hire a lawyer, whatever you want to do.  **I did nothing!** |
| 32 | BK | **I a hundred percent innocent!  If this coming to me** |
| 32 | BK | **from G-d and I have to die in jail, I'll die in jail.** |
| 32 | BK | I did nothing!  I'm innocent men.  I abide the law. |
| 32 | BK | I would do nothing!  It happend like this that I told |
| 32 | BK | Oleg!  **I would kill myself now, why I should tell Oleg** |
| 32 | BK | **Why I shouldn't turn away and walk.  I did nothing!** |
| 32 | BK | **I did nothing!  I didn't break the law!** |
| 32 | BK | **I didn't do nothing!  Sir!** |
| 32 | | Special Agent: Luke Hardison: |
| | | Okay, All right.  We just need to finish up a little |
| | | paper work. |

Page - 4

4/28/2021                "Very difficult person". Last boss of 'old Russian mafia' convicted in the U.S.

HOME    SOCIETY    ECONOMY    PEOPLE    INVESTIGATION    BUSINESS CARD

Updated at 14:03, 26-04-2021

# "Very difficult person". Last boss of 'old Russian mafia' convicted in the U.S.

en.crimerussia.com
23 ноября 2017, 19:23



Elderly Boris Nayfeld, once-boss of 'Russian mafia' on Brighton Beach, could not even afford a lawyer. Photo: The CrimeRussia

One of the last remaining bosses of 'old Russian mafia' who used to operate on the U.S. East Cost in the 1990s has been convicted in New York. 70-year-old Boris 'Biba' Nayfeld has got another prison term, this time – for extortion. He has already served several terms, and every time he managed to get the minimal punishment. This time 'Biba' is going to get out of jail by the end of the year.

## Behind the boss's back

The native of Gomel, Belarus (according to some information, he was a house-painter there) has immigrated to the U.S. back in the 1970s. Upon arrival to Brighton Beach, Boris Nayfeld became a member of the 'inner circle' of a criminal 'authority' admitted to the 'thieves' world' – Evsei 'Evsei Leningradsky' Agron who lived on Brighton Beach in New York and was the founder of so-called 'Russian mafia' in the U.S. 'Biba' became his driver and later bodyguard.

The gang had committed racketeering, extortion, robberies, and murders; it terrorized not only the local people but also the law enforcement structures. Upon getting accustomed to the new life, Nayfeld understood that it is possible to make much more money in America – but Agron did not support his ideas to expand the spheres of influence. Then 'Biba' started plotting his own heroin trade scheme behind the back of his boss. On May 4, 1985, a person in a sports suit has shoot Agron point-blank hitting his right temple twice. This happened near the elevator of the Evsei's home when he was going to a bathhouse. Boris Nayfeld was waiting for his boss in the car near the entrance; he was the first on the list of potential assassin's paymasters, but the police could not prove anything. This case still remains officially unsolved.

B. NAYFELD!
01-14-2016
MCC-7 SOUTH
POPULATION!
B. KOTLYARSKY
01-14-2016
SOLITARY
CONFINEMENT
01/14/2016-01/21/16

TO MURDER
US CITIZENT
FOR $250.000
23 MONTH!!

TO SAVE US
CITIZENT
NO FINANCIAL
GAIN-41
MONTH

000023

ORIGINAL

U.S. DISTRICT COURT
FILED
JAN 22 2016
S.D. OF N.Y.

Approved: _____
ANDREW MARK THOMAS
Assistant United States Attorney

Before:  HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

        - v. -                      :

ANATOLY POTIK,                      :

            Defendant.              :

- - - - - - - - - - - - - - - - - - x

## 16 MAG 486

COMPLAINT

Violations of
18 U.S.C. 1958 and 2

COUNTY OF OFFENSE
NEW YORK

DOC # _____

SOUTHERN DISTRICT OF NEW YORK, ss.:

        LUKE HARDISON, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

### COUNT ONE
#### (Murder-for-Hire)

        1.  From on or about October 31, 2015 to on or about
January 21, 2016, in the Southern District of New York and
elsewhere, ANATOLY POTIK, the defendant, traveled in and caused
another to travel in interstate and foreign commerce, and used
and caused another to use the mail and any facility of
interstate and foreign commerce, with the intent that a murder
be committed in violation of the laws of a State and the United
States, as consideration for the receipt of, as consideration
for a promise or agreement to pay, anything of pecuniary value,
and aided and abetted the same, to wit, POTIK offered money to
an individual in exchange for the murder of a victim, which
arrangement depended in part on use of cellular telephones
operating on interstate networks and in part on international
travel.

        (Title 18, United States Code, Section 1958 and 2.)

16.   Based on physical surveillance conducted on or about January 14, 2016, and an interview of the Victim,[1] and a review of a draft English-language transcription of the January 14, 2016 telephone call from the Victim Cellphone to ANATOLY POTIK, I have learned, in part, the following:

a.   The Victim met the Hitman at Restaurant-2.

b.   The Victim asked the Hitman, in substance and in part, for assurances that the Victim would be safe. The Hitman agreed to call ANATOLY POTIK, the defendant. The Victim dialed POTIK's number on the Victim Cellphone, and handed the Victim Cellphone to the Hitman.

c.   The Hitman said aloud, in substance and in part, (1) Forget about your son-in-law, (2) I intend to get everything to the last penny from you, and (3) I will see you soon.

d.   The Hitman departed Restaurant-3. Shortly thereafter, the Hitman was arrested.

17.   On or about January 20, 2016 and on or about January 21, 2016, the Relative contacted the FBI. Based on conversations with the agent who spoke to the Relative, I have learned the Relative said, in substance and in part, the following:

a.   The Relative was in possession of an audio recording, stored on an electronic recording device, of a conversation between the Hitman and ANATOLY POTIK, the defendant.

b.   The audio recording captured a conversation between POTIK and the Hitman, during which POTIK offered the Hitman money to arrange for the Victim's murder.

c.   The Relative offered to provide the audio recording to law enforcement. The Relative said the Relative gave the tape to a lawyer in Florida ("Lawyer-1"), and the Relative provided the FBI with Lawyer-1's contact information.

---

[1] The Victim's conversation at Restaurant-2 on January 14, 2016, which was conducted primarily in Russian, was audio recorded with the Victim's knowledge. The FBI is currently translating and transcribing the recording; I have not yet reviewed any transcription.

6

18.   On or about January 20, 2016, I visited the residence of ANATOLY POTIK, the defendant. Nobody answered the door. I left a business card identifying myself as a federal agent. I then called the telephone number known to the Victim as POTIK's number. My call was answered by a male with a Russian accent, who asked me to speak to his lawyer. Shortly thereafter, also on January 20, 2016, I received a message from a lawyer ("Lawyer-2") stating that Lawyer-2 represented POTIK and directing all inquiries concerning POTIK to Lawyer-2.

19.   Based on a conversation with the Victim, I have learned, in part, the following:

a.   Late in the evening on or about January 20, 2016, the Daughter approached the Victim in their apartment in New York, New York.

b.   The Daughter told the Victim, in substance and in part, that the Victim could have just paid and that the Daughter would entertain a proposed settlement if the Victim would tell law enforcement he had made things up.

c.   Prior to the January 20, 2016 conversation with the Daughter, the Victim had not discussed the Murder Plot with the Daughter, nor had the Victim discussed with the Daughter the Victim's conversations with law enforcement.

20.   Based on conversations with other law enforcement officers, I have learned that on or about January 22, 2016, FBI agents took possession of an electronic audio recording device from Lawyer-1.[2]

21.   Based on a review of records maintained CBP and conversations with an airline employee, I have learned, in part, that on or about January 21, 2016, at approximately 7:36 p.m., ANATOLY POTIK, the defendant, booked seats for himself and his wife on an international flight departing from New York at approximately 11:00 p.m. that same day.

22.   On January 21, 2016, CBP officers intercepted ANATLOY POTIK, the defendant, at John F. Kennedy Airport and arrested him.

---

[2] The electronic audio recording device is currently being shipped from Florida to New York. It has not been reviewed by law enforcement.

Case 1:16-mj-00486-UA   Document 19   Filed 06/08/16   Page 1 of 1

**COMPLAINT/REMOVAL DISMISSAL**
United States District Court
Southern District of New York

Mag. Judge Dkt. No: **16 MJ-486**          Date **6-7-16**

USAO No. **2015R01696**

The Government respectfully requests the Court to dismiss without prejudice the  ✓ Complaint _____ Removal Proceedings in

United States v. **Anatoly Perk**

The Complaint/Rule 40 Affidavit was filed on _____

✓ U.S. Marshals please withdraw warrant.

ASSISTANT UNITED STATES ATTORNEY

**Andrew Thomas**
(Print name)

SO ORDERED:

**Kevin Nathaniel Fox**
UNITED STATES MAGISTRATE JUDGE

DATE **6/8/16**

Distribution:   White → Court      Yellow → U.S. Marshals      Green → Pretrial Services      Pink → AUSA Copy

3/23/2018         SDNY CM/ECF Version 6.2.1

CLOSED,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:17-cr-00232-AKH-1

Case title: USA v. Potik

Date Filed: 06/07/2016
Date Terminated: 12/11/2017

Assigned to: Judge Alvin K. Hellerstein

**Defendant (1)**

Anatoly Potik
*TERMINATED: 12/11/2017*

represented by **Robert G. Stahl**
Stahl Farella , LLC
220 St. Paul Street
Westfield, NJ 07090
(908)-301-9001
Fax: (908)-301-9008
Email: rstahl@stahlesq.com
*ATTORNEY TO BE NOTICED*
Designation: Retained

| **Pending Counts** | **Disposition** |
|---|---|
| 18:894.F CONSPIRACY TO COLLECT CREDIT BY EXTORTION (1) | |

**Highest Offense Level (Opening)**
Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:4.F WITHHOLDING INFORMATION ON A CRIME (MISPRISION OF EXTORTION) (1s) | Nolle Prosequi |

**Highest Offense Level (Terminated)**
Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

**USA**

represented by **Andrew Mark Thomas**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     SEALED NOLLE PROSEQUI

            -v.-                  :     17 Cr. 232 (AKH)

ANATOLY POTIK,                    :

            Defendant.            :

- - - - - - - - - - - - - - - x



1.   The filing of this nolle prosequi will dispose of this case with respect to ANATOLY POTIK, the defendant.

2.   On June 7, 2016, Information 17 Cr. 232 was filed, charging ANATOLY POTIK with conspiring to collect debt through extortionate means, in violation of Title 18, United States Code, Section 894. On or about April 24, 2017, Information S1 17 Cr. 232 was filed, charging ANATOLY POTIK with misprision of felony, in violation of Title 18, United States Code, Section 4.

3.   On or about April 24, 2017, the defendant attempted to plead guilty to Information S1 17 Cr. 232 pursuant to a plea agreement. Among other things, that agreement included a waiver of venue with respect to the charged offense.

4.   On or about September 26, 2017, after holding a supplemental plea allocution, the Court rejected the defendant's plea of guilty.

Case 22-2750, Document 65, 08/30/2023, 3563522, Page32 of 157 000029

4.   In light of the foregoing, I recommend that an order of nolle prosequi be filed as to ANATOLY POTIK, the defendant, with respect to Information 17 Cr. 232 and Information S1 17 Cr. 232.

Andrew Thomas
Assistant United States Attorney
(212) 637-2106

Dated:   New York, New York
December 11, 2017

3

Upon the foregoing recommendation, I hereby direct, with leave of the Court, that an order of nolle prosequi be filed as to ANATOLY POTIK, the defendant, with respect to Information 17 Cr. 232 and Information S1 17 Cr. 232.

JOON H. KIM
Acting United States Attorney
Southern District of New York

Dated:     New York, New York
           December 11, 2017

SO ORDERED:

HON. ALVIN K. HELLERSTEIN
United States District Judge
Southern District of New York

Dated:     New York, New York
           December 11, 2017

1093

000031

# 164572 MILITARY ASSAULT RIFLES
# AK-47, AKM-47
# ANATOLY POTIK OFFERED FOR SALE 516-626-8021
## „AVACO" LTD.

28, James Baucher Blvd.   Tel. in N.Y.        Tel./Fax:003592/66 51 47
1126 Sofia, Bulgaria       516 626 8021      Tel./Fax:003592/963 02 33

QUOTATION

| No. | DESCRIPTION | QUANTITY | PRICE IN US$ |
|---|---|---|---|
| 01 | AKM-47 East German Fixed butt, Cal 7,62 x 39 | 47,724 | $ 70.00 |
| 02 | AKM-47 East German Folding butt, Cal 7,62 x 39 | 9,636 | $ 70.00 |
| 03 | AK-47 East German Fixed butt, Cal 7,62 x 39 | 47,724 | $ 70.00 |
| 04 | AK-47 East German Folding butt, Cal 7,62 x 39 | 9,619 | $ 70.00 |
| 05 | AK-47 Hungarian Fixed butt, Cal 7,62 x 39 | 49,869 | $ 70.00 |
| 06 | LMG PKM, Cal 7,62 x 54 (PKMS) with tripod | 100 | $ 1,000.00 |
| 07 | RPG-7 Launchers | 100 | $ 600.00 |
| 08 | 23mm Twin Barrel ZU-23 MG | 5 | $ 26,000.00 |
| 09 | 14,5mm Quadruple Barrel Gun | 10 | $ 27,000.00 |
| 10 | SAMS Strela-3 Launchers | 5 | $ 6,000.00 |
| 11 | 60mm Mortar | 24 | $ 3,000.00 |
| 12 | 82mm Mortar | 12 | $ 3,800.00 |
| 13 | 120mm Mortar | 8 | $ 5,000.00 |
| 14 | Ammunition Cal. 7,62 x 39 | 1,000,000 | $ 66.00 |
| 15 | Ammunition Cal. 7,62 x 54 | 1,000,000 | $ 73.00 |
| 16 | Turtle Grenades | 40,000 | $ 5.00 |
| 17 | RPG-7 Rockets | 1,000 | $ 75.00 |
| 18 | Ammunition 23mm Belted | 500,000 | $ 6.00 |
| 19 | Ammunition 14,5mm Belted | 500,000 | $ 2.50 |
| 20 | Missiles Strela-3 | 20 | $ 14,000.00 |
| 21 | Mortar Grenades 60mm | 1,000 | $ 30.00 |
| 22 | Mortar Grenades 82mm | 1,000 | $ 35.00 |
| 23 | Mortar Grenades 120mm | 400 | $ 50.00 |

# HOW MANY AMERICAN LIVES COULD BE LOST?

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                            16 CR 215 (LAK)

 5
      BORIS KOTLYARSKY,
 6
                                             Arraignment
 7              Defendant.

 8    ------------------------------------x

 9                                           New York, N.Y.
                                             March 22, 2016
10                                           3:55 p.m.

11    Before:

12                    HON. LEWIS A. KAPLAN,

13                                           District Judge

14                         APPEARANCES

15    PREET BHARARA
          United States Attorney for the
16        Southern District of New York
      ANDREW THOMAS
17        Assistant United States Attorney

18    MIRVIS & ASSOCIATES, P.C.
          Attorneys for Defendant
19    TONY MIRVIS

20    ALSO PRESENT:   LUKE HARDISON, FBI

21

22

23

24

25
```

1    MR. THOMAS:  Yes, your Honor.  This is an extortion

2    case.  Mr. Kotlyarsky was aware of a wealthy businessperson,

3    and he was also aware that one of his business colleagues and

4    intimates had a grudge, to say the least, against this victim.

5    And Mr. Kotlyarsky set in motion --

6            THE COURT:  Mr. Kotlyarsky, if you think you're doing

7    yourself any good by shaking your head and carrying on, I would

8    tell you right now, you're not.

9            THE DEFENDANT:  I'm sorry.

10           THE COURT:  All right.  Go ahead, counselor.

11           MR. THOMAS:  Mr. Kotlyarsky set in motion what he

12   sometimes has described as the assistance of introducing this

13   victim to the person who had been contacted to arrange for a

14   murder of the victim.  And the purpose of those meetings, which

15   were then carried out in January this year, was to allow the

16   victim to pay money, essentially, to foil the murder plot that

17   he understood was set in motion against him.

18           THE COURT:  So the victim was to pay the guy that had

19   been hired to organize the hit?

20           MR. THOMAS:  That's right.

21           THE COURT:  Okay.

22           MR. THOMAS:  Mr. Kotlyarsky had introduced the

23   business idea to that hitman.

24           THE COURT:  Introduced the business?

25           MR. THOMAS:  Idea to the hitman.

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4             v.                        16 Cr. 215 (LAK)

 5   BORIS KOTLYARSKY,
                                         Conference
 6                Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         June 2, 2016
 9                                       2:30 p.m.

10   Before:

11          HON. LEWIS A. KAPLAN

12                                       District Judge

13

14

15

16          APPEARANCES

17
     PREET BHARARA
18        United States Attorney for the
          Southern District of New York
19   ANDREW THOMAS
          Assistant United States Attorney
20

21   TONY MIRVIS
          Attorney for Defendant
22

23   Also Present:

24        LUKE HARDISON - Special Agent FBI

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    THE COURT: I never heard previously of any post-

2    arrest statements. Are there any?

3    MR. THOMAS: Yes, your Honor.

4    THE COURT: The ground for a motion with respect to

5    post-arrest statements would be what?

6    MR. MIRVIS: Judge, the grounds would be coercion

7    possibly. I don't know. I haven't looked into it.

8    THE COURT: You are winging it here, right?

9    MR. MIRVIS: I really haven't looked in depth in terms

10   of motions. I could submit a letter to the Court advising the

11   Court.

12   THE COURT: How are you going to move on the face of

13   the indictment to dismiss for improper venue? Doesn't the

14   indictment allege venue?

15   MR. MIRVIS: Judge, it does.

16   THE COURT: So we'll put that one aside.

17   Jurisdiction?

18   MR. MIRVIS: Judge, again, I haven't really looked

19   into the motions yet. I can send you a letter.

20   THE COURT: I don't need a letter. I'll wait for the

21   motions. Any objection to my excluding time through September

22   14th?

23   MR. MIRVIS: No objection, your Honor.

24   THE COURT: Time is excluded through September 14th.

25   I find that the interests of justice served thereby, including



EXCLUSIVE

# Bizarre twist in Russian magnate's 'murder-for-hire' suit

By Oli Coleman

June 16, 2016 1:30:31pm



Oleg Mitnik and Ronit Mitnik.
Photo: David McGlynn / Chad Rachman

In the latest twist in one of the most bizarre and bitter New York divorce cases in memory, a criminal suit accusing a father of taking out a hit against his daughter's husband has been dismissed.

Last week, a district court judge threw out a case against Anatoly Potik that claimed he had paid a Russian assassin $100,000 to take out shipping magnate Oleg Mitnik, his daughter Ronit Mitnik's estranged husband. Oleg told the FBI that he only survived because he paid the would-be hit man $125,000 not to go through with the job. *NOTHING 3 SHOULD RECORDING 01-22-2016*

But now sources in New York socialite Ronit's camp speculate that Oleg drew attention to the supposed plot as a red herring in their bitter $20 million divorce battle, which also involves a custody fight over their two children and has been raging since 2014.

...sed on the court's swift dismissal of the bizarre tale, the same sources speculate that either Oleg himself set up the plot in order to make it seem as if he were being threatened by his wife's family, or that someone else masterminded a scam designed to get Oleg to write a check for the $125,000, which he says he did.

Either way, insiders believe the alleged assassination saga may have been used as an astonishing strategy in divorce court.

"Oleg has what's been purported to be hundreds of millions of dollars sitting overseas and doesn't want to give that up in the divorce," said a source. "This was a great diversion."

The criminal suit, filed on Jan. 22, claimed that Ronit told Oleg "late in the evening" on Jan. 20 that she "would entertain a proposed [divorce] settlement" if he "would tell law enforcement he had made things up" regarding the assassination attempt. But the warring couple is still nowhere near a settlement.

Potik's attorney Robert Stahl said, "Through hard work and presenting evidence and through the further investigation by the government, they realized that the charges should be dismissed." An attorney for Oleg — who runs TRT International, a Newark, NJ, freight-shipping company — said his client has done nothing wrong.

FILED UNDER   **CELEBRITY DIVORCES, CHILD CUSTODY**

Recommended by

10/23/2020

Mob boss who spared millionaire's life will squeal on mobster cronies

METRO

# Mob boss who spared millionaire's life will squeal on mobster cronies

By Kaja Whitehouse

October 13, 2016 | 12:14am



Oleg Mitnik
Stephen Yang

No sleep in Brooklyn.

A Brighton Beach mob boss — arrested for extorting a millionaire he was hired to murder — has agreed to squeal on his Russian mobster cronies, it emerged in Manhattan federal court Wednesday.

Boris "Biba" Nayfeld, 69, signed a plea agreement with "cooperation provisions," said Manhattan federal Judge Katherine Forrest.

Nayfeld has also agreed to testify if needed.

The reputed heroin trafficker admitted in court that he has a reputation for "being associated with organized crime," and is singing to the feds in hopes of reducing his sentence in the bizarre hit plot.

We've updated our Terms of Use and by continuing, you are agreeing to comply with them.

1/3

10/23/2020                              Mob boss who spared millionaire's life will squeal on mobster cronies

Nayfeld faces as much as 40 years in prison for first accepting a fee of $100,000 to whack someone and then agreeing to spare the man's life if he paid him $125,000.

Russian businessman Anatoly Potik allegedly asked Nayfeld to off his son-in-law, shipping magnate Oleg Mitnik, because Mitnik was embroiled in a $20 million divorce with Potik's daughter.

Nayfeld turned the hit job into a shake-down when he realized he could get a premium to not kill him, the feds have said.

In court Wednesday, Nayfeld said his alleged co-conspirator, Boris Kotlyarsky, told him that Mitnik was "a good guy" after Nayfeld revealed the devious plot to Kotlyarsky.

"Why don't you relay that information to him (Mitnik) and he will pay you for that," Nayfeld said Kotlyarsky suggested.

Mitnik, who runs runs TRT International, a Newark, did not return a request for comment.

Jennifer Aniston Won't Apologize For Her
Controversial Holiday Spot
Locksmith of Hearts

**SEE ALSO**

Bizarre twist in Russian magnate's 'murder-for-hire' suit

In discussing Nayfeld's plea agreement, the judge told him he must "truthfully and completely disclose all information with respect to yourself and others about which the US Attorney's office is asking of you."

"Yes," Nayfeld replied through a translator.

"And the US Attorney can use that information for any purpose," the judge said.

"Yes," Nayfeld replied.

"And you are agreeing to testify if asked to testify?" she asked.

"Yes," he said.

BROOKLYN, GANGS, MOB, MURDERS, 10/13/16

**SPONSORED**



Federal prosecutors quietly dropped an extortion case against a Russian businessman who was once accused of ordering a hit on his son-in-law. (Maksim Mazur/Getty Images/iStockphoto)

Federal prosecutors quietly dropped an extortion case against a Russian businessman who was once accused of ordering a hit on his son-in-law, the Daily News has learned.

The Manhattan U.S. Attorney's Office filed paperwork in December indicating that it would no longer pursue a case against Anatoly Potik.

FEEDBACK

ADVERTISEMENT

10/25/2020                     Russian magnate who allegedly put hit on son-in-law has extortion case tossed - New York Daily News

SECTIONS                                      ONLY $1 FOR 3 MONTHS                 LOG IN
                                                 Subscribe now

Our new battleplan on the              SEE IT: NYPD car blasts Trump                  Fearmongers, cheer
COVID warfront: Andrew                       endorsement from                                       and reality: T
Cuomo lays out New York's...                 loudspeaker — cop involved...                           New York Cit

ADVERTISEMENT

NYC CRIME    NEW YORK

# Russian magnate who allegedly put hit on son-in-law has extortion case tossed

By VICTORIA BEKIEMPIS
MAR 09, 2018 AT 8:42 PM

  



SPECIAL OFFER        $1 FOR 3 MONTHS
                     Get election news and more

                                          ACCESS NOW

ACCESS NOW

ADVERTISEMENT

Transcripts from an October hearing indicate the decision was "based on Mr. Potik's health."

**MOST READ**

**Our new battleplan on the COVID warfront: Andrew Cuomo lays out New York's strategy to defeat the virus**

**Fearmongers, cheerleaders and reality: The truth about New York City today**

**SEE IT: NYPD car blasts Trump endorsement from loudspeaker — cop involved suspended**

FEEDBACK

Potik, 69, allegedly hired a hit man to whack his daughter's estranged husband, shipping big Oleg Mitnik, for $100,000, according to a criminal complaint from 2016.

**SPECIAL OFFER**     **$1 FOR 3 MONTHS**
                      Get election news and more

ACCESS NOW

Potik, 69, tried pleading guilty in August to a different count — withholding info about extortion from cops.

Advertisement

A judge rejected Potik's plea, taking issues with his "credibility," court documents reveal.

Mitnik, who is embroiled in a $16 million divorce with Potik's daughter, filed a lawsuit against his father-in-law in Manhattan Supreme Court lawsuit on Friday, alleging he has suffered emotional distress.

6 Credit Cards You Should Not Ignore If You Have Excellent Credit

NERDWALLET | SPONSORED

Challenge Your Brain With This Must-Play Strategy Game. No Install.

SPECIAL OFFER　　$1 FOR 3 MONTHS

ACCESS NOW

000045

# U.S.A. citizen Oleg Mitnik - "Victim"

# NO financial or any gain for Boris

# Kotlyarsky

# 100% evidence in support!

Alert – Alert – Alert

# The Noble Deed is the Federal Crime
## Case No. 1:16-CR-00215 (LAK)

**1)The victim, U.S. citizen Oleg Mitnik provided evidence**

   **to the court: innocent and noble deed by Boris**

   **Kotlyarsky.**

1) **01-14-2016 – Statement** to S.A. Luke Hardison.

2) **01-09-2017 –** PSR – The victim impact **§26-27**

3) **12-03-2017 –** Email to attorney of the defendant.

4) **12-14-2017 –** Declaration to the court under the oath.

5) **03-18-2018 –** To N.Y. Post interview.

6) 03-26-2018 – Email to attorney of the defendant; stating that the

   defendant, Boris Kotlyarsky, **never tried to extort Oleg**

   **Mitnik! The defendant, Boris Kotlyarsky, saved the life**

   **of U.S. citizen Oleg Mitnik with no financial** or any gain for

   Boris Kotlyarsky – **100% noble deed!**

New York Post, Sunday, March 18, 2018 • nypost.com

# Terrified 'slay plot' mogul goes to court



**HITS BACK:** Shipping mogul Oleg Mitnik has sued his father-in-law, Anatoly Potik (inset), and wife, Ronit (inset), after Potik allegedly hired Boris Nayfeld (right) to kill him.



# SCARY GEEZER 'HITMAN'

**By KATHIANNE BONIELLO**

Upper East Side shipping magnate Oleg Mitnik says the feds have sold him out by letting free two men accused of plotting his murder.

"The man who was supposed to kill me is out after 16 or 17 months, and the guy who ordered my murder, he's walking free. So that's justice," Mitnik told The Post.

"I am terrified."

So Mitnik is turning to a different venue in his search for justice — Manhattan Supreme Court.

He is suing his father-in-law, Anatoly Potik, and his estranged wife, Ronit Mitnik, for $20 million for emotional distress and defamation.

The alleged murder-for-hire scheme unfolded amid Mitnik's bitter, ongoing divorce from Ronit, a socialite.

Mitnik says the aging Potik is one of the people who plotted his death. He identifies the other as Boris Nayfeld, 70, whom feds have long linked to the Russian mob.

Potik was arrested in January 2016 and charged with hiring Nay-feld to kill Mitnik. The price was $100,000.

If Potik's alleged plot had succeeded, his daughter would have benefitted from Oleg Mitnik's $7 million life-insurance policy.

She also would have inherited their $9 million worth of real estate, including a Manhattan condo and a vacation home in Quogue, LI, Oleg Mitnik alleges in his suit.

Mitnik says he thwarted the murder plan by calling the cops and offering Nayfeld $125,000 to call off the hit.

The feds picked up both men, but they eventually dropped their case against Potik, citing his deteriorating health.

Potik has a criminal history dating to 1985 and allegedly told Oleg Mitnik that he used murder "to resolve business disputes in the past," according to the lawsuit.

"He's a very dangerous man. Somebody who smiles in your face and stabs you in the back," Oleg Mitnik said. "Every time I walk out of my building, I have to look left and right and take different exits and take different roads."

"They think I'm safe now and that he is not capable to do anything because it's in the public eye," said Mitnik, who has started carrying a gun.

Nayfeld — who admitted his role in the case — was freed on probation in October.

Nayfeld told The Associated Press in January that he would like to go back to Russia, and that the two years he spent locked up for plotting to kill Mitnik was punishment enough.

"I lost everything," Nayfeld told the AP. "I lost job[.] I lost my time for stay in prison. I lost my wife. This is enough punish for me."

But Mitnik doesn't buy it.

Mitnik believes his father-in-law, who he says has deep ties to the Russian and Italian mobs, was let off easy because he helped authorities investigate other crimes.

"They basically sold me out for cases. I think it sends the wrong message," Oleg Mitnik said of federal prosecutors.

Mitnik contends in court papers that his wife and her father have tarnished his name by spreading rumors that he framed Potik by cooking up false allegations of a murder plot and by paying off federal agents.

"I think it will clear my name," Oleg Mitnik said of the civil lawsuit. "I think it's important for justice to be served at least at some angle."

Ronit Mitnik's lawyer, Robert Wallack, dismissed the allegations as "total fiction" and "utter garbage."

The murder plot was allegedly hatched after Potik testified in his daughter's divorce case, then flew to Moscow to meet with Nayfeld at the Azimut Olympic Hotel, says Mitnik's lawsuit.

Around the time, Potik went to Russia, Ronit Mitnik forbade their daughter from riding in Oleg Mitnik's car, claiming a routine trip across Central Park to school was "too dangerous," the husband said in court papers.

Oleg Mitnik says Ronit Mitnik's claim that he had invented the murder plot has driven a rift between him and their two children — a 19-year-old son and 18-year-old daughter.

"I want peace for my family . . . I want to move on," he said.

There are only two names in the NY Post article from 03/18/2018 titled
Scary Geezer "Hitman" by Kathianne Boniello. The names are:

A. Anatoly Potik – The father-in-law of Oleg Mitnik. Potik was the Master
   Mind who contracted The Hit Man for $250,000 to kill Potik's son-in-law,
   US citizen – Oleg Mitnik.
   Evidence:
   – Transcripts: 01/08/2016-01/11/2016-01/14/2016-10/12/2016
   – 3.5 hours of recordings from all of the meetings where The Murder Plot
     was discussed. (Sealed by US Attorney – Preet Bharara)?

B. Boris Nayfeld – The Hit Man – Who agreed to kill Potik's son-in-law
   for $250,000. (01/08/2016 – 01/11/2016 – 10/12/2016)

C. Boris Kotlyarsky is my name, and I accidently found out about this Murder
   Plot. I stopped the Murder Plot by suggesting to Oleg Mitnik that he
   report this Murder Plot to the FBI. (Which Oleg Mitnik did one week later.)
   I stayed in touch with Oleg Mitnik to make sure he would be ok. There
   was no financial or any gain for me in doing this.

Oleg Mitnik stated in a 03/18/2018 NY Post article:
   – The Fed's have sold him out by letting free two men accused of plotting
     his murder!

The Hit Man was sentenced to 23 months for this case and one more case of Extortion.
   – Two different cases – 23 months for two – at the Government's request!

The guy who ordered Mitnik's murder:
   – This case and one more case of Extortion.
   – Two different cases were dismissed at the Government's request!

" So that's Justice " – Mitnik told The Post. – I am terrified!

Boris Nayfeld and Anatoly Potik:
   – No Indictment for this case!

000049

UNCLASSIFIED

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION



26 Federal Plaza, New York, NY 10278

File Number:  ███████████

Requesting Official(s) and Office(s):  SA Hardison, NYO C-24

Task Number(s) and Date Completed:  528644, 5/13/2016

Name and Office of Linguist(s):  LA Ilona Desyatnik

Name and Office of Reviewer(s):  Click here to enter text.

Source Language(s):  Russian

Target Language:  English

Source File Information
    Name of Audio File or CD:
    *If Applicable*—Call Number:
        —Date, Time, Duration:  01/14/2016 ██████  ████████
        —Target Number:
        —Direction, Number:

## VERBATIM TRANSLATION

Participants:
CHS        CHS                    BN        Boris Nayfeld
UM         Unknown Male

Abbreviations:
UI         Unintelligible         PH         Phonetic
OV         Voice overlap          SC         Simultaneous conversation
[ ]        Translator's exegesis  *Italics*  English

UNCLASSIFIED

UNCLASSIFIED
01/14/2016

Task # 528644

SA Hardison: This is Special Agent Luke Hardison. Today's date is Thursday, January the 14th, 2016. The time is approximately 1:40 PM. The following is a consensually recorded conversation between CHS and Boris Nayfeld, Boris Kotlyarskiy and persons yet unknown. I am handing the recording device to the CHS now.

    [CHS driving] [Sound of heavy breath] [sound of cell phone message tone]

17:20    [Sound of message]

22:02    [Sound of ringtone]

25:10    [CHS on the phone]

CHS:    *Uh huh. Uh huh, okay, but...okay, thank you.*

26:00

CHS:    I am going to be ten to fifteen minutes late, but I will be there. So, I don't know, I'm just letting you know. [Another voice on the phone, very low volume, UI] Thank you. I'm sorry.

31:40    [Five spraying sounds]

33:25

CHS:    *Hello, it's not good because the told me last time. Okay, I can call him but it's not going to be a good effect. I'm sure he is home. I don't know that, I'm not hiding anything. But I'm just telling you for sure, if I call him, it's going to set off ringing bells. I should have called him and asked him for the first time. I told him I'm going to be late. Ninety nine percent he is not going to come. He told me before. You heard it on tape. I introduced you. From now on I do not really care, he is not involved. I give you 99 percent he is home, 99.9. Okay, bye.*

37:50    [CHS exits from the car]

40:10

UM:    *Hi, how are you?*

CHS:    *I'm just meeting somebody for a beer. No it's okay, not long. What is today a holiday? Jesus Christ?*

UM:    *I think someone died.*

CHS:    *Oh there is no parking. I drove around the building.*

1
UNCLASSIFIED

**Akiva Shapiro Law**

**From:**       Oleg Mitnik
**Sent:**        Sunday, December 3, 2017 7:19 PM
**To:**          Akiva Shapiro Law
**Subject:**     Re: Declaration and Cvr Ltr for Boris Kotlyarsky

Thank you. I will go over the letter with lawyers on Tuesday-Wednesday.
Will get back to you shortly.
Again and Again I'm very sorry about Boris being there. I had no choice and you can see in the documents I always told
FBI not to even arrest or charge Kotlyarskiy. Was not my call. What choice did I have???    You see how they played him
and let my father in law walked away. I'm still fitting. Would love to get my hands on all the recordings I did and 3,5
hours tape between Nayfeld and Kotlyarskiy.   I had the interview with New York Times. They supposed to write big
story about this case.  How innocent people go to jail and murders walk away by giving up to the government
information.
This is American justice system. 97% off cases cooperation.
I'm sorry.

Oleg Mitnik
President

TRT International
250 Port Street
Newark NJ 07114

Main. +973 344 7100
Fax +973 344 7757

000054

**12.14.2017 Case No: 16-CR-215 (LAK) US Citizen Oleg Mitnik's
declaration under oath. Declaration in support of Mr. Kotlyarsky's
innocence and noble deed.**

As the purported victim of the murder plot, I'm familiar with
many of the relevant facts in this case:

Before signing this declaration I reviewed records of the case
including transcript of Mr. Kotlyarsky plea allocation and sentencing.

Based on those records and my knowledge of certain facts, I
believe **Mr. Kotlyrasky sentence was based on a misapprehension of
material facts.**

As such, **I provide this declaration to clarify the following
relevant facts from my firsthand knowledge.**

After Mr. Kotlyarsky informed me of the murder plot, it was my
idea not his (Boris Kotlyarsky's ) for me to meet with the hit man, Boris
Nayfeld.  I asked Mr. Kotlyarsky, not the other way around if he (Boris
Kotlyarsky) could arrange for a meeting between Mr. Nayfeld and me.
This request was recorded on the recording device provided to me, by
S.A.Luke Harding.

**From the onset (around late October 2015), Mr Kotlyarsky told
me that I should go to police to get them involved** in early November
2015.  I filed a complaint with the police department; my complaint was
forwarded to federal authorities in mid-November 2015.

**At no point did Mr. Kotlyarsky ever asked me or lead me to
believe that he was expected in any way to be compensated
financially,** for telling me about my own murder plot.  **Or for arranging
a meeting with hired hit man Mr. Boris Nayfield, nor for Mr.
Kotlyarsky's effort to save my life!**

4

I honestly believe that if not for Mr. Kotlyrsky's intervention, I would not be alive today, he helped prevent my death!

Most respectfully, as the intended victim at that time, **Mr. Kotlyarsky could have easily asked me for compensation given what he did, but Mr. Boris Kotlyrsky did not.**

What I understand, **the government presented NO EVIDENCE! From Mr. Nayfield** demonstrated any agreement between Mr. Kotlyrsky and Mr. Nayfeld in which Mr. Kotlyrsky would receive a portion of what I paid Mr. Nayfeld. **Indeed my understanding is that government stated 10.01.2016 there was no financial gain for Mr. Kotlyrsky from Mr. Nayfeld (10.01.2016, 10.12.2016)**

Mr. Nayfeld entered in cooperative agreement with the federal government requiring him to fully disclose the crime and answer all questions.

**There was no expectation of financial gain for Mr. Kotlyrsky from me! No evidence of any financial gain for Mr. Kotlyrsky from Mr. Nayfeld. The courts' conclusion was thus completely unfounded and in diametrically opposed to the truth of what happened.**

**As I've stated before, I DO NOT BELIEVE THAT MR. KOTLYRSKY SHOULD HAVE BEEN CHARGED WITH EXTORTION IN THE FIRST PLACE! I stated so at the time of his (Mr. Kotlyrsky) arrest and my feelings on this matter have not changed. I told this to the probation officer (§27)** who noted my statements in Mr. Kotlyrsky PSR, see PSR, VICTIM IMPACT.

Is it my **concrete feeling** that Mr. Kotlyrsky conviction and **imprisonment, given the truth of what I know happened and given probable** outcome had he (Boris Kotlyrsky) not intervened constitute A **GROSS MISCARRIAGE OF JUSTICE!!**

The Victim!! Gross Miscarriage of justice.

Just disturbing to me is the severely disproportioning sentence imposed upon Mr.Kotlyrsky compared to that of the mobster hit man, Mr. Nayfeld and the master mind financier of the murder plot, Mr Potik.

**Mr. Kotlyrsky, who saved my life,** received a sentence of 41 months.  In comparison, despite **entering into a contract to murder me.  Mr. Nayfeld was sentenced to mere 23 months** in case #1 Murder For Hire (Case # 2 Conspiracy to extort, **case #2 was hidden from the court).**  Despite, conceiving, financing and setting in motion a murder plot against me, Mr Potik manipulated **to enter a Nolle prosecution on the government request.  In case #1 (Case #2 conspiracy to extort Mr. Nayfeld – also Nolle prosecution on the government request.**  Anatoly Potik and Boris Nayfeld committed **four crimes combined total of 23 months!  Mr Kotlyrsky, saved life of US Citizen, Oleg Mitnik with no financial or any gain sentence 41 months.**  Almost double those two men and four crimes!

**As a result, Mr Kotlyrsky, whose intervention failed the murder plot against Me (Oleg Mitnik)** and saved my life, received a sentence nearly twice that.  The hit man who intended to murder me (Oleg Mitnik) and the person who's originally plotted and **paid for my murder walked away scot free!!**

**Nothing could be more closely constitute a GROSS MISCARRIAGE OF JUSTICE to Mr. Kotlyrsky.**

I (Oleg Mitnik) repeat what I told the probation department " **I DO NOT BELIEVE THAT MR. KOTLYRSKY SHOULD HAVE EVER BEEN CHARGED WITH EXTORTION IN THIS CASE"**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                          Case No. 16-cr-215 (LAK)

BORIS KOTLYARSKY,

      Defendant.

DECLARATION OF OLEG MITNIK

      I, Oleg Mitnik, declare under penalty of perjury pursuant to 28 USC § 1746 that the following statements are true and correct to the best of my knowledge and belief.

1.     I make this declaration in support of Mr. Kotlyarsky's motion for a sentence reduction.

2.     As the purported victim of the murder plot, I am familiar with many of the relevant fact of this case.

3.     I was recently contacted by Mr. Kotlyarsky's attorney for purposes of providing this Declaration.

4.     Before signing this Declaration, I reviewed records of this case, including transcripts of Mr. Kotlyarsky's plea allocution and sentencing, and excerpts of his Presentence Report (PSR).

5.     Based on those records and my knowledge of certain facts, I believe Mr. Kotlyarsky's sentence was based on a misapprehension of material facts.

000058

6. As such, I provide this Declaration to clarify the following relevant facts from my first-hand knowledge.

7. After Mr. Kotlyarsky informed me of the murder plot, it was my idea, not his, for me to meet with the hit man, Boris Nayfeld. I asked Mr. Kotlyarsky, not the other way around, if he could arrange for a meeting between Mr. Nayfeld and me. I believe my initiating this request was recorded on a recording device provided to me by Special Agent Luke Hardison for the 12/3/2015 meeting between Mr. Kotlyarsky and me.

8. From the onset (around late October 2015), Mr. Kotlyarsky told me that I should go to the police to get them involved. In early November 2015, I filed a complaint with my neighborhood police department. In mid-November 2015, my complaint was forwarded to an organized crime task force. Shortly thereafter, I met with federal authorities.

9. At no point did Mr. Kotlyarsky ever ask me or lead me to believe that he expected in any way to be compensated financially for telling me about the murder plot, for arranging for the meeting with Mr. Nayfeld, or for his efforts in helping to save my life.

10. Although Mr. Kotlyarsky and I did have a conversation about business, it was a casual conversation, the type that any two business men may have, who have long been friends, are catching up after a time of absence, and who think well of and wish well for each other. The conversation was unequivocally disconnected from anything to do with the murder plot. Mr. Kotlyarsky was not a stranger to me. We have known each other for many years, and were from the same country, Russia.

11. In the sentencing of Mr. Kotlyarsky, the prosecutor stated that "not only was [Mr. Kotlyarsky's] intervention not the reason [I am] safe, but in intervening at all, Mr. Kotlyarsky made it worse and, in fact, risked

greater harm. See Sentencing Transcript, p. 13. As the victim, I can state unequivocally that this statement could not be further from the truth. I fully believe that but for Mr. Kotlyarsky's intervention, I would not be alive today. Contrary to the prosecutor's contention, Mr. Kotlyarsky did not take "advantage of [my] specific fear of death", Id., but rather, he helped prevent my death.

12. The Court, after hearing the prosecutor's statements, concluded that "in one way or another, there would be an economic benefit to [Mr. Kotlyarsky] no matter how it turned out". Id, p. 17. Most respectfully, as the intended victim, as the person conversing with Mr. Kotlyarsky at that time, I do not see it that way. Mr. Kotlyarsky could have easily asked me for compensation given what he did, but he did not.

13. From what I understand, the government presented no evidence from Mr. Nayfeld demonstrating any agreement between Mr. Kotlyarsky and Mr. Nayfeld in which Mr. Kotlyarsky would receive a portion of what I paid Mr. Nayfeld. Indeed, my understanding is that the Government stated there was no financial gain for Mr. Kotlyarsky from Mr. Nayfeld.

14. To me that speaks volumes, given that Mr. Nayfeld entered a cooperative agreement with the government, requiring him to fully disclose the crime and answer all questions.

15. As such, there was no expectation of financial gain for Mr. Kotlyarsky from me, and no evidence of any financial gain for Mr. Kotlyarsky from Mr. Nayfeld. The Court's conclusion was thus completely unfounded and in diametrically opposed to the truth of what happened.

16. While I understand that Mr. Kotlyarsky pled guilty in a plea bargain, as I've stated before, I do not believe that Mr. Kotlyarsky should have been charged with extortion in the first place. I stated so at the time of

000060

his arrest, and my feelings on the matter have not changed. I told this to the Probation Officer who noted my statement in Mr. Kotlyarsky's PSR. See PSR, Victim Impact.

17. It is my concerted feeling that Mr. Kotlyarsky's conviction and imprisonment, given the truth of what I know happened, and given probable outcome had he not intervened, constitutes a gross miscarriage of justice.

18. And just as disturbing to me is the severely disproportionate sentence imposed upon Mr. Kotlyarsky for his plea, compared to that of the mobster hit man, Mr. Nayfeld, and the mastermind financier of the murder plot, Mr. Potik.

19. Mr. Kotlyarsky, who saved my life, received a sentence of 41 months. In comparison, despite entering into a contract to murder me and subsequently extorting money from me to stave off the murder, Mr. Nayfeld was sentence by Judge Forrest to a mere 23 months. And despite conceiving, financing and setting in motion a murder plot against me, Mr. Potik somehow manipulated the government to enter a a *nolle prosequi*!

20. As a result, Mr. Kotlyarsky, whose intervention foiled the murder plot and saved my life, received a sentence nearly twice that of the hit man who intended to murder me, and the person who originally plotted and paid my murder walks away scot-free.

21. Nothing could more closely constitute a gross miscarriage of justice to Mr. Kotlyarsky.

22. I repeat what I told the Probation Department. I do not believe that Mr. Kotlyarsky should ever have been charged with extortion in this case, and most certainly, at the age of 70, he should not have to serve 41 months of imprisonment, even if he did accept a plea bargain for

reasons personal to him.

23. In the hopes that justice and sensibility may gain the upper hand in this case, I submit this Declaration in support of Mr. Kotlyarsky's motion.

24. I implore the Court to grant the relief requested by Mr. Kotlyarsky, and any other relief that may be just, fair and equitable.

By _____

   Oleg Mitnik

State of NY
County of New York

Affirmed before me this 14ᵗʰ day of December 2017.

_____
Notary Public

MICHAEL SENZ
Notary Public - State of New York
No. 01SE6114952
Qualified in New York County
My Comm. Expires Aug. 30, 2020

METRO

# Man sues father-in-law, wife after they allegedly plotted to kill him

By Kathianne Boniello

March 17, 2018 | 8:36pm | Updated



Oleg Mitnik
Imayne Seidman

Upper East Side shipping magnate Oleg Mitnik says the feds have sold him out by letting free two men accused of plotting his murder.

"The man who was supposed to kill me is out after 16 or 17 months, and the guy who ordered my murder, he's walking free. So that's justice," Mitnik told The Post.

"I am terrified."



**SEE ALSO**

Hitman plays father-in-law, target against each other, gets more money: courts

So Mitnik is turning to a different venue in his search for justice — Manhattan Supreme Court.

Man sues father-in-law, wife after they allegedly plotted to kill him

He is suing his father-in-law, Anatoly Potik, and his estranged wife, Ronit Mitnik, for $20 million for emotional distress and defamation.

The alleged murder-for-hire scheme unfolded amid Mitnik's bitter, ongoing divorce from Ronit, a socialite.

Mitnik says the aging Potik is one of the people who plotted his death. He identifies the other as Boris Nayfeld, 70, whom feds have long linked to the Russian mob.

Potik was arrested in January 2016 and charged with hiring Nayfeld to kill Mitnik. The price was $100,000.

If Potik's alleged plot had succeeded, his daughter would have benefitted from Oleg Mitnik's $7 million life-insurance policy.

She also would have inherited their $9 million worth of real estate, including a Manhattan condo and a vacation home in Quogue, LI, Oleg Mitnik alleges in his suit.

Mitnik says he thwarted the murder plan by calling the cops and offering Nayfeld $125,000 to call off the hit.

The feds picked up both men, but they eventually dropped their case against Potik, citing his deteriorating health.

Potik has a criminal history dating to 1985 and allegedly told Oleg Mitnik that he used murder "to resolve business disputes in the past," according to the lawsuit.

"He's a very dangerous man. Somebody who smiles in your face and stabs you in the back," Oleg Mitnik said. "Every time I walk out of my building, I have to look left and right, and take different exits and take different roads."

"They think I'm safe now and that he is not capable to do anything because it's in the public eye," said Mitnik, who has started carrying a gun.

Nayfeld — who admitted his role in the case — was freed on probation in October.

Nayfeld told The Associated Press in January that he would like to go back to Russia, and that the two years he spent locked up for plotting to kill Mitnik was punishment enough.

"I lost everything," Nayfeld told the AP. "I lost job, I lost my time for stay in prison. I lost my wife. This is enough punish for me."

But Mitnik doesn't buy it.

**SEE ALSO**
**Man loses bid to lock up father-in-law who put hit on him**

Mitnik believes his father-in-law, who he says has deep ties to the Russian and Italian mobs, was let off easy because he helped authorities investigate other crimes.

"They basically sold me out for cases. I think it sends the wrong message," Oleg Mitnik said of federal prosecutors.

Mitnik contends in court papers that his wife and her father have tarnished his name by spreading rumors that he framed Potik by cooking up false allegations of a murder plot and by paying off federal agents.

"I think it will clear my name," Oleg Mitnik said of the civil lawsuit. "I think it's important for justice to be served at least at some angle."

Ronit Mitnik's lawyer, Robert Wallack, dismissed the allegations as "total fiction" and "utter garbage."

Man sues father-in-law, wife after they allegedly plotted to kill him

The murder plot was allegedly hatched after Potik testified in his daughter's divorce case, then flew to Moscow to meet with Nayfeld at the Azimut Olympic Hotel, says Mitnik's lawsuit.

Around the time Potik went to Russia, Ronit Mitnik forbade their daughter from riding in Oleg Mitnik's car, claiming a routine trip across Central Park to school was "too dangerous," the husband said in court papers.

Oleg Mitnik says Ronit Mitnik's claim that he had invented the murder plot has driven a rift between him and their two children — a 19-year-old son and 18-year-old daughter.

"I want peace for my family ... I want to move on," he said.

FILED UNDER   **EXTORTION**, **HIT MAN**, **UPPER EAST SIDE**, **3/17/18**

000065

9

# Boris Nayfeld – Hitman Russian Mobster

## Cooperating Witness

## No financial or any gain for Boris Kotlyarsky

## 100% evidence in support!

000066



000067



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 1, 2016

**By Email**
Tony Mirvis, Esq.
The Mirvis Law Firm, P.C.
28 Dooley Street, 3rd Floor
Brooklyn, NY 11235

Dennis J. Ring
Law Office of Dennis J. Ring
148-29 Cross Island Parkway
Whitestone, NY 11357

Re:  *United States v. Boris Kotlyarsky,*
16 Cr. 215 (LAK)

Dear Counsel:

Pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure, the Government is producing to the defendant the following discovery by email:

| Content | Bates Range |
|---|---|
| Western Union transaction record | BK_0027 to BK_0035 |
| Draft affidavit | BK_0036 |

By separate cover today, AUSA Nathan Rehn will transmit additional potential discovery in this matter. Those materials have been maintained by AUSA Rehn since the Government received them, but they will be released to the trial team at the end of the business day on Monday. Should you have a specific and founded objection to release of those documents to the trial team, please alert AUSA Rehn by Monday evening.

The Government advises you that a witness has informed the Government, in sum and substance, that the defendant was offered direct payment in connection with the events described in the Indictment, but declined the offer.

GAC5nayP

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,     New York, N.Y.

4           v.             16 Cr. 207 (KBF)

5   BORIS NAYFELD,

6            Defendant.

7   ------------------------------x

8                     October 12, 2016
                       11:20 a.m.

9

10  Before:

11            HON. KATHERINE B. FORREST,

12                       District Judge

13

14                APPEARANCES

15  PREET BHARARA
       United States Attorney for the
16      Southern District of New York
   BY: ANDREW THOMAS
17      Assistant United States Attorney

18  FRANK TASSONE
       Attorney for Defendant
19  ALSO PRESENT:  ANDREW TARUTZ, Russian Interpreter

20

21

22

23

24

25

GAC5nayP

1    Do you understand that?

2        THE DEFENDANT:  (In English)  Yes.

3        THE COURT:  And we will go back over that later on.

4    Are you married at present.

5        THE DEFENDANT:  (In English)  Yes.

6        THE COURT:  How long have you been married for?

7        MR. THOMAS:  Your Honor, the government makes the

8    suggestion that Mr. Nayfeld respond in Russian and then the

9    interpreter can translate into English.

10        THE COURT:  All right.  That's fine with me.  It is

11   really whatever the defendant wants, but if it is easier for

12   you, Mr. Nayfeld, to respond in Russian, go ahead and do that

13   and we will -- it might be easier for you.

14        THE DEFENDANT:  Okay.

15        THE COURT:  So, the question for you, sir, is when

16   were you married or for how long have you been married?  Either

17   one.

18        THE DEFENDANT:  (In English)  I think --

19        THE DEFENDANT:  About 2002 or 2003.

20        THE COURT:  And do you have any children from that

21   marriage or any other marriage that you may have had?

22        THE DEFENDANT:  I have two kids with my first wife.

23   And I also have a son with my second wife.

24        THE COURT:  All right.  And how old are the two

25   children that you have with your first wife?

7

GAC5hayP

1          THE DEFENDANT:  I don't remember exactly.  My daughter
2     is 42 and my son is about 37.
3          THE COURT:  And how about the son from your second
4     marriage; how old is he?
5          THE DEFENDANT:  29.
6          THE COURT:  All right.
7          And what was the highest level of education that you
8     completed?
9          THE DEFENDANT:  In Russia I graduated from high school
10    and also I graduated from culinary school.
11         THE COURT:  And was the culinary school also in
12    Russia?
13         THE DEFENDANT:  At that time it was the Soviet Union.
14    The answer is yes.
15         THE COURT:  Have you ever taken any classes in any
16    educational institution here in the United States?
17         THE DEFENDANT:  No.
18         THE COURT:  Do you read and write in Russian?
19         THE DEFENDANT:  Yes.
20         THE COURT:  Do you read and write in English?
21         THE DEFENDANT:  No.
22         THE COURT:  Have you ever been treated or hospitalized
23    for any kind of drug addiction or drug problem?
24         THE DEFENDANT:  No.
25         THE COURT:  Have you ever been treated or hospitalized

GAC5nayP

1   to have my deputy label as Court Exhibit 1 that is in English

2   and that is signed by you and it is a waiver of indictment form

3   and I am going to ask you, first, if it is your signature on

4   that form.

5             THE DEFENDANT:  (In English)  Yes.

6             THE COURT:  You said, yes, it was your signature?

7             THE DEFENDANT:  (In English)  Yes.

8             THE COURT:  And did you have this form translated for

9   you into Russian before you signed it?

10            THE DEFENDANT:  (In English)  Yes.

11            THE COURT:  Did you understand what you were signing

12  when you signed this waiver of indictment form?

13            THE DEFENDANT:  (In English)  Yes.

14            THE COURT:  Now, let me just make sure that I have

15  described a couple of things for you with respect to this

16  waiver of indictment form and what it means.

17            Do you have a copy of the information in front of you?

18            THE DEFENDANT:  (In English)  Yes.

19            THE COURT:  Have you seen the information prior to it

20  being just handed to you right now?

21            THE DEFENDANT:  (In English)  Yes.

22            THE COURT:  Do you understand that the information

23  contains serious criminal charges against you?

24            THE DEFENDANT:  (In English)  Yes.

25            THE COURT:  And, do you understand that you have a

14

GAC5nayP

1    I am going to do now is arraign you on the information but I am

2    not going to ask you how you plead, I am going to go through

3    the other preliminary matters relating to an arraignment.

4         My first question to you is has the information been

5    read to you in Russian?

6         THE DEFENDANT:  (In English)  Yes.

7         THE COURT:  Do you understand that you are charged in

8    Count One with participating in a conspiracy to commit

9    extortion?

10        THE DEFENDANT:  (In English)  Yes.

11        THE COURT:  Do you understand that in Count Two you

12   are charged with extortion?

13        THE DEFENDANT:  (In English)  Yes.

14        THE COURT:  Have you had an opportunity to speak with

15   Mr. Tassone about these charges?

16        THE DEFENDANT:  (In English)  Yes.

17        THE COURT:  Would you like to have me read the

18   information to you here now in open court?  And it could be

19   translated for you again from English into Russian as I read it

20   to you.

21        THE DEFENDANT:  (In English)  Yes.

22        MR. TASSONE:  May I, your Honor?

23        THE COURT:  Yes.

24        MR. TASSONE:  The Court is asking if you want the

25   Judge to read this to you.

GAC5nayP

1    special assessment?

2              Do you understand that?

3              THE DEFENDANT: (In English) Yes.

4              THE COURT: Do you understand that in your plea

5    agreement you have also agreed to forfeit any property or

6    proceeds traceable to the offense?

7              THE DEFENDANT: (In English) Yes.

8              THE COURT: And do you understand that, again,

9    forfeiture is a separate financial penalty, separate and apart

10   from the fine, the restitution, and the mandatory special

11   assessment?

12             THE DEFENDANT: (In English) Yes.

13             THE COURT: Now, when you signed this plea agreement

14   did you understand what you were agreeing to?

15             THE DEFENDANT: (In English) Yes.

16             THE COURT: Had you had this plea agreement translated

17   for you into Russian before you signed it?

18             THE DEFENDANT: (In English) Yes.

19             THE COURT: Did you discuss this plea agreement with

20   your lawyer before you signed it?

21             THE DEFENDANT: (In English) Yes.

22             THE COURT: Did you sign this plea agreement

23   voluntarily and of your own free will?

24             THE DEFENDANT: (In English) Yes.

25             THE COURT: I am going to have my deputy mark as Court

3

Exhibit #6:
**Page 14; Line 18-20**
**The Court:**

It could be translated for you again from English into Russian as I read it to

you?

**The Defendant:**

(In English) Yes.

Exhibit #7:
**Page 25; Line 16-21**
**The Court:**

**Have you had this plea agreement translated for you into**

**Russian before you signed it?**

**The Defendant:**

(In English) Yes.

**The Court:**

**Did you discuss this plea agreement translated for you**

**into Russian before you signed it?**

**The Defendant:**

(In English) Yes.

TRULINCS  25056077 - NAYFELD, BORIS - Unit: BRO-I-C

---

FROM: 25056077
TO:
SUBJECT: Habeas Corpus
DATE: 10/09/2017 02:38:17 PM

# 17CV 8102

THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

---

BORIS NAYFELD,                        )
                                       )    Date: October 9, 2017
         Plaintiff,                    )
                                       )    Case No.: 1:16CR00207-001
    vs.                                )
                                       )    HABEAUS CORPUS PETITION BASED ON ILLEGAL CONFINEMENT
UNITED STATES OF AMERICA,              )    BEYOND EXPIRATION OF SENTENCE COMPLETION IN **VIOLATION**
                                       )    OF PLAINTIFF'S CONSTITUTIONAL RIGHTS
         Respondent.                   )

---

I, BORIS NAYFELD, acting in my Pro Se capacity, am filing this Habeaus Corpus petition to the Court to bring to its attention that I am being held beyond the date of the termination of the sentence imposed for my probation violation.

I, BORIS NAYFELD, acting in my Pro Se capacity, am seeking an order from this Court releasing me from custody immediately.

I, BORIS NAYFELD, am presently incarcerated. I served the 19.5 months period that I was to serve as a consequence of the sentence of my probation violation as of September 14, 2017. Today is October 9, 2017. That makes it just a month shy of me having been held here beyond the termination of the sentence that was handed down to me by your Court. Being held like this after my sentence has been completed is in violation of my Constitutional rights. I am presently being held in violation of my Constitutional rights.

I, BORIS NAYFELD, entered into custody on January 19, 2015 and my sentence began calculating from then forward to Thursday, September 14th, 2017, which was 19.5 months out of the 23 months in total that I was obligated to serve given the sentence that was handed down to me, inclusive of so-called "good-time" credits given for good behavior while incarcerated.

I, BORIS NAYFELD, hereby request that this Honorable Court issue an order immediately releasing me from this unlawful custody upon after receipt and consideration of this petition for a Habeaus Corpus. In the event that this Court for some reason decides against doing so, I respectfully request that I be afforded a court appearance so that this matter can be addressed in open court as I am a Russian with limited understanding of the English language and very little understanding of legal terminology.

000076

36

1    figure out is did you agree with anybody else to go to the

2    son-in-law and try to get money out of the son-in-law for not

3    killing him.

4         THE DEFENDANT:  At that time Mitnik was in the process

5    of divorcing his wife and one of the issues there was $20

6    million but I was not involved in that.

7         THE COURT:  No, I understand.  So let me just ask —

8    well, I want to see —

9         THE DEFENDANT:  It was Mr. Kotlyarsky who told me

10   about this.

11        THE COURT:  Put aside the $20 million.  What I want to

12   know is did you agree with anybody else to try to extort money

13   to take money from the son-in-law?

14        THE DEFENDANT:  (In English)  No.

15        THE COURT:  No.

16        So, tell me what is going on here.  Maybe I don't

17   understand the story correctly.  I thought that it was a

18   conspiracy to extort money from the son-in-law in exchange for

19   not killing the son-in-law.

20        MR. THOMAS:  Your Honor, that is the principle thrust

21   of the charged conspiracy.  Perhaps, with the Court's

22   indulgence, I could ask questions for Mr. Mayfield to reveal

23   the fact pattern?

24        THE COURT:  Well, tell me what do you think?  What is

25   going on with the proffer?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

GAC5nayP

1          MR. THOMAS:  I think the legal meaning of extortion

2     and the Russian organized crime meaning of extortion may not be

3     perfectly synonymous.  I suggest that the Court perhaps ask

4     Mr. Nayfeld if he understands himself to have a reputation for

5     violence and to be an individual associated with organized

6     crime.

7          THE COURT:  What I am interested in before we even get

8     there is he has to have agreed with somebody else to extort who

9     is not the victim, right?

10         MR. THOMAS:  Absolutely, your Honor.

11         THE COURT:  So I am trying to figure out who is that

12     person, what is the name of that person.  Is there a name?

13         MR. THOMAS:  There are.

14         THE COURT:  I don't need the name, but just for

15     purposes of clarifying the record it might help.

16         MR. THOMAS:  Sure, sure.  And I am in complete

17     agreement on that account.  There are multiple persons.  The

18     name that he was giving to the Court was Kotlyarsky, Boris

19     Kotlyarsky.

20         THE COURT:  Kotlyarsky is the person who he agreed

21     with to go extort money from the son-in-law?

22         MR. THOMAS:  With the Court's indulgence, with respect

23     to Count One, the conspiracy charged in Count One has three

24     objects.  One object of that conspiracy is the extortion

25     related to the murder-for-hire plot.  But, the conspiracy to

000078

38

1   extort, taking advantage of Mr. Nayfeld's reputation for

2   violence and his associations to Russian organized crime

3   includes Mr. Kotlyarsky and others, it is just that

4   Mr. Kotlyarsky was principally involved in two of the three

5   charged objects and, in particular, the one relating to the

6   murder-for-hire plot.

7           THE COURT:  He still has to agree with somebody else

8   to extort money.

9           MR. THOMAS:  Yes, your Honor.  So, what I was

10  proposing --

11          THE COURT:  Or a thing of value.

12          MR. THOMAS:  -- perhaps to order these proceedings and

13  also elicit helpful information from the defendant is if the

14  Court asked about his reputation and then asked if he agreed

15  with others to use his reputation to make money for himself and

16  others and proceed from there.

17          THE COURT:  All right.  I am happy to do it that way

18  and see if it is going to lead us into the right area.  It is

19  not a narrative, I have to say this is sort of an odd way to

20  proceed this morning, but I am happy to try to do it this way.

21  Normally you folks would figure out how you want to capture the

22  information.

23          MR. THOMAS:  Your Honor, may I have one moment to talk

24  to Mr. Tassone?

25          THE COURT:  I don't want to have you reform something

GAC5nayP

1    extraordinary way to go about this kind of complex, very

2    serious crime. What I am going to suggest you do is that we

3    adjourn and reconvene and that you folks figure out how you

4    want to cast this and talk to the defendant so that we have

5    some logical way to proceed because you are going to have a

6    mess on your hands. And if you end up with a situation where

7    the plea goes -- where the cooperation agreement goes south,

8    you need something that is going to hold up and I am concerned

9    about it.

10            MR. THOMAS: Your Honor, I share your concerns. I

11    appreciate the suggestion, and with the Court's indulgence,

12    would take it. The government unexpectedly finds itself in

13    this position here and would greatly appreciate the opportunity

14    to reconvene at a later time.

15            THE COURT: Let's do that. We are at this point so it

16    is not that we have -- we have to redo everything, but let's

17    adjourn for the moment to allow everyone to talk about what the

18    elements are and to make sure that the defendant understands

19    what the elements are, and then we will determine whether his

20    conduct meets those elements. It is possible his conduct does

21    not meet those elements, or it is possible that when you talk

22    about the story in a way that's not telling the whole story and

23    every aspect of the story but focus on those parts that matter,

24    that we are able to get there.

25            So, let's adjourn. You folks work out with Joe

CRIME    FALSE DOCUMENTS MANUFACTURED BY THE GOVERNMENT

GUINNESS WORLD RECORD MUST BE EGNALAGED!!!THIS HAPPAND IN THE
SOUTHERN DISTRICT OF NEW YORK, N.Y. FEDERAL DISTRICT COURT!!!
EVIDENCE TO BE RECORDED:
1-10/12/2016 THE DEFENDANT WHO DID NOT READ OR WRITE IN ENGLISH
IN 45 MINUTES LEARNED TO A   LAW SCHOOL READING AND WRITING
ENGLISH JUST DUARING AJORMENT IN THE COURT WITH OUT LEAVING THE
COURT! THE DEFENDANT ENTERED THIS COURT ROOM WITH OUT
KNOWLADGE OF READING OR WRITING IN ENGLISH LANGWICH WITH
EVIDENCE IN SUPPORT BY TRANSCRIPT FROM FEDERAL COURT AS WITNESS
2 - 07/27/2017 SENTENCING HEARING GOVERNMENT PROSECUTOR:
BECAME ATTORNEY FOR THE DEFENDANT WITHOUT RETAINER BESIDE
ATTORNEY FOR THE DEFENDANT WAS ALREADY PRESENT IN THE COURT
ROOM!! HIS NAME FRANK TASSONE ESQ FOR THE DEFENDANT PRESENT!!!
THESE WERE HON.JUDGE; COURT REPORTER; ATTORNEY FOR DEFENDANT;
SECOND ATTORNEY/PROSECUTOR! WHO BETRAY THE GOVERNMENT! AND
PROTECTED THE NOTORIOSE RUSSIAN MOBSTER –THE HITMAN AND
CAREERCRIMINAL! WHO AGREE TO MURDER FOR $250.000! who Murdered
BEFORE
3 - DEPARTAMENT OF JUSTICE NEW MATH CALCULATION ZERO-EQUAL
 240 MONTHS (0=240) ZERO FOR A. POTIK-240 MONTH FOR IRA BLOOM
FOR ABSOLUTELY SIMULAR THE MURDER-FOR-HIRE PLOT WHAT A MATH!
THIS IS TWO U.S. CITIZENS
4 - IN FEDERAL CASE US CITIZENT WAS ARRESTED-INDICTED-EXTORTED TO
PLEA-SENTENCED AND ALL THIS MADGIC WAS DONE WITH NOT A SINGLE
EVIDENCE OF WRONG DOING AND VICTIM AND GOVERNMENT WITNESS
TESTIFIED ON DEFENDANT BEHALF AND NOBLE DEED DONE BY
DEFENDANT! MAGIC AND WORLD RECORD WAS   TWO CRIMINALS WHO
AGREED TO MURDER U.S.  CITIZENT WERE SENTENCEDTO 23 MONTH AND
PERSON WHO SAVED U.S. CITIZEN WITH NOT FINANCIAL OR ANY GAIN WAS
SENTENCED TO 41 MONTHS!!!

000081

1

10/12/2016 – New York Post – 10/13/2016

**Rules of law were violated! Crime was committed!**

**Conspiracy: The Government – The Court – The Attorney**

Exhibit #1:

**10/12/2016; Page 6; Line #7-9,**

**AUSA Thomas:**

Your honor, the government makes the suggestion that Mr. Nayfeld **responds in**

**Russian** and the interpreter can translate into English.

Exhibit # 2:

**Page 7; Line 15-21**

**The Court:**

Do you read and write in English?!

**The Defendant:**

# No!

Exhibit #3:

**Page 9; Line 24-25**

**The Court:**

Let me ask counsel, does either counsel have any doubt to **Mr. Nayfeld's**

competency to consider the matters that are going to be gone over today?

**(7/19/2018 – AUSA Thomas)**

A) AUSA Thomas: The government has no doubts. (7/19/2018)

B) Mr. Tessone ESQ: No doubt on behalf of counsel for defendant.

C) The Court has no doubt.

(7/19/2018 – AUSA Thomas, declaration!)

Exhibit #4:
Page 11; Line 8-10
The Court:

# Did you have this form translated for you into Russian before you signed it?

The Defendant:

(In English) Yes!

Exhibit #5:
Page 14; Line 4-6
The Court:

# My first question to you is has the information been read to you in Russian?

The Defendant:

(In English) Yes!

**Christine Siwik**

rom:       akiva@akivashapirolawpllc.com
ent:        Wednesday, May 01, 2019 1:51 PM
To:         Christine Siwik
Subject:   1-16-cr-00207-KBF, Plea - 10/12/16

Dear Ms. Siwik,

As discussed, please confirm with your reporter the following questions we have with the transcript in in this matter for October 12, 2016:

1. With respect to page 42, lines 15 – 25 through page 43, lines 1 – 12, the statement attributed to defendant Boris Nayfeld is made in perfect English without any errors. Boris Nayfeld, however, was incapable of properly speaking English and his reading skills were rudimentary. It is therefore impossible for Boris Nayfeld to have spoken this statement on his own or to have read it from a paper as is, or to have read it in Russian to be translated.

2. Therefore, I am inquiring as to what were the circumstances surrounding the transcribing of that statement. *I*
    a. Was it read from paper on the record by someone other than Boris Nayfeld?
    b. Was it given in writing to the reporter to transcribe onto the record?
    c. What was the exact sequence of events which caused that perfect English statement to be transcribed as it was onto the record?

3. Is there an audio recording of this proceeding that we may refer to?

Much thanks for your assistance in getting to the bottom of this. If the reporter is available for me to speak to, I would appreciate arranging for a call.

Best,
Akiva Shapiro

Akiva Shapiro, Esq.
Akiva Shapiro Law, PLLC
A Personal Attorney for Your Life, Business & Legacy

**Office**
1 West Park Drive
Old Bethpage, NY 11804

**Mailing Address**
696 Old Bethpage Road #540
Old Bethpage, NY 11804

Phone: 516-806-0762
Direct: 347-435-6529
Fax: 347-710-2543
Akiva@AkivaShapiroLawPLLC.com
www.AkivaShapiroLawPLLC.com



1

## Mandatory Law for Federal Courts!

Precedent! The defendant's statement was manufactured
by Prosecutor's Office of Southern District of New York, NY.
In conspiracy between Federal Prosecutor's Office and Court Reporters
Office this manufactured statement was inserted in the court transcript
dated as of 10/12/2016 without court's knowledge.
There is no recording of this court hearing exists. What is the reason?
The Defense Team had no permission to record this hearing either.
That did open the door for Criminal Conspiracy between Federal
Prosecutor's Office and Office of the Court Reporters of the Southern
District of New York, NY.
All the hearings in Federal Court (except National Security cases)
should have been recorded.
Attorney for defendant should have an opportunity to compare
court transcript with the recording.
In present time Prosecutor's Office has an opportunity to tweak any
statement and insert it in the court transcript, seal – do not docket
which leaves no trace of crime.
Then Prosecutor's Office do not care of any defendant's allocution.
**The same has happened to General M. Flynn.**
All evidences of Criminal Conspiracy are on file and ready to be
provided.
**That could happen only without mandatory recording.**
**This must be stopped immediately.**

Boris Kotlyarsky .
Address: 1900 East 22nd street
          Brooklyn, NY 11229
Email:   kotliar46@mail.ru
Email:   kotlyarskyb@gmail.com

Phone:   (718)382-9393
Cell:    (917)969-9984

000094

Christine Siwik

From: akiva@akivashapirolawpllc.com
Sent: Wednesday, May 01, 2019 1:51 PM
To: Christine Siwik
Subject: 1-18-cr-00207-KBF: Plea - 10/12/16

Dear Ms. Siwik,

As discussed, please confirm with your reporter the following questions we have with the transcript in in this matter for October 12, 2016:

1. With respect to page 42, lines 15 – 25 through page 43, lines 1 – 12, the statement attributed to defendant Boris Nayfeld is made in perfect English without any errors. Boris Nayfeld, however, was incapable of properly speaking English and his reading skills were rudimentary. It is therefore impossible for Boris Nayfeld to have spoken this statement on his own or to have read it from a paper as is, or to have read it in Russian to be translated.

2. Therefore, I am inquiring as to what were the circumstances surrounding the transcribing of that statement:
   a. Was it read from paper on the record by someone other than Boris Nayfeld?
   b. Was it given in writing to the reporter to transcribe onto the record?
   c. What was the exact sequence of events which caused that perfect English statement to be transcribed as it was onto the record?

3. Is there an audio recording of this proceeding that we may refer to?

Much thanks for your assistance in getting to the bottom of this. If the reporter is available for me to speak to, i would appreciate arranging for a call.

Best,
Akiva Shapiro

Akiva Shapiro, Esq.
Akiva Shapiro Law, PLLC
Personal Attorney for Your Life, Business & Legacy

Office
West Park Drive
Old Bethpage, NY 11804

Mailing Address
98 Old Bethpage Road #540
Old Bethpage, NY 11804

Phone: 516-806-0762
Direct: 347-435-6529
Fax: 347-710-2543
Akiva@AkivaShapiroLawPLLC.com
www.AkivaShapiroLawPLLC.com

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 4, 2017

BY ECF AND BY HAND

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Boris Kotlyarsky,*
        16 Cr. 215 (LAK)

Dear Judge Kaplan:

The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for May 11, 2017. For the reasons explained below, the Government submits that a sentence within the applicable Guidelines range of 41 to 51 months' imprisonment is fair and appropriate in this case.

**A.    Factual Background**

**Background**

Around June 2015, Anatoly Potik introduced the defendant to Boris Nayfeld, a well-known member of Russian organized crime groups with a reputation for violence. (*See* October 27, 2016 Plea Transcript ("Tr.") at 17:16-18.) After their initial meeting at the restaurant, Kotlyarsky and Nayfeld remained in contact throughout the summer by telephone and in person. Kotlyarsky learned that Nayfeld was destitute and looking ways to make money.

In the early fall, Nayfeld told Kotlyarsky a shocking story: Potik had proposed that Nayfeld murder, or arrange for the murder, of an unidentified person. From Nayfeld's description, the defendant identified the intended victim as Potik's son-in-law (the "Victim"). (Tr. 16:22-17:15.) Kotlyarsky told Nayfeld that the Victim was a wealthy person and a good person, and that the Victim would likely be willing to pay Nayfeld if Kotlyarsky and Nayfeld were to tell him about the threat to his life. Kotlyarsky did not report the murder plot to the authorities.

On October 31, 2015, Kotlyarsky met the Victim at a restaurant in Brooklyn, New York. At the meeting, Kotlyarsky informed the Victim, in substance and in part, that the Victim's father-in-law had approached Nayfeld with a contract to kill the Victim in exchange for a $100,000 payment. Kotlyarsky offered to broker a meeting between the Victim and Nayfeld. At the time, the Victim understood Kotlyarsky to be offering the Victim an opportunity to intercede with Nayfeld before

On January 11, 2016, Kotlyarsky drove Nayfeld to a meeting a restaurant in Brooklyn. Nayfeld went inside the restaurant and met the Victim. Kotlyarsky met the Son and went with him inside a nearby restaurant. (PSR ¶ 19.)

During the January 11, 2016 meeting, Nayfeld told the Victim that the Victim was lucky Kotlyarsky intervened. Nayfeld also demanded immediate payment. (PSR ¶ 20.) For example:

> BN:       [Victim, Victim] that doesn't do it justice. Thank God someone like Borya Kotlyarsky came into the picture, because if it wasn't for him…Basically what is the difference to me? There will be nothing earned with just the mind. Thank God it turned out this way. [Victim], I want to see everything already end for you, for you. [Victim,] the only thing is, this will cost you 125,000 because I have to give to the guys and something would be left for me.

> Victim:   One hundred twenty five, by when, by when do you need it? May I, may I make a transfer? Or how do you want it?

> BN:       Meaning what? It's already needed.

> Victim:   It's already needed?

> BN:       Yes, it's already needed. Do it, figure out how to do it. It's already needed.

After further discussion, Nayfeld and the Victim agreed that the Victim would pay Nayfeld's demand, with the first $50,000 by January 15, 2016.

On January 14, 2016, the Victim met Nayfeld at Restaurant-2. The Victim asked Nayfeld, in substance and in part, for assurances that the Victim would be safe. Nayfeld agreed to call Potik. The Victim dialed Potik's number on his own cellphone, and handed the cellphone to Nayfeld. Nayfeld said aloud, in substance and in part, do not touch the Victim or I will harm you. In Nayfeld's presence, the Victim then wrote a check in the amount of $50,000 and signed it. The check did not specify a recipient. (PSR ¶ 20.)

Nayfeld departed Restaurant-2 with the check in his possession. Immediately after Nayfeld left Restaurant-3, law enforcement officers approached him. Nayfeld then uttered an expletive and tore up the check. (PSR ¶ 20.) The FBI arrested Nayfeld. Shortly after Nayfeld's arrest, Kotlyarsky arrived outside the restaurant. The FBI then arrested the defendant, too.

On January 28, 2016, Boris Kotlyarsky was ordered released from custody on conditions. While on release, the defendant attempted to shape or prevent Nayfeld testimony against him by (a) drafting an affidavit for Nayfeld's signature containing the false and misleading statements that Nayfeld had merely attempted to sell the Victim information, (b) providing protected case documents to Nayfeld's son, (c) proposing that Kotlyarsky sue the Victim's family and share a portion of the recovery with Nayfeld's family, and (d) asking Nayfeld's son whether Nayfeld had thought about what his criminal associates in Russia would think if they learned that Nayfeld had

Boris Kotlyarsky

Saved life of U.S. citizen Oleg Mitnik

No financial gain or any gain!

100% noble deed!

100% evidence in support!

000098

# Statement

According to my beliefs, the only reason for

my involvement was

**#1:** To try to prevent a tragedy

**#2:** To try to save the life of a human being

And there are no other reasons, including

financial ones.

**All of the documents recorded by the**

**government will 100% prove every word**

**in my statements.**

# Boris Kotlyarsky

## Boris Koltyarsky – State of Mind

**Reasons to get involved:**
   1) To prevent tragedy.
   2) To save life of human being.

### Tape: 0007 - 12/16/2015

**00:03:03**

**BK:** In my heart I know that life was given to you, to

me, and to everybody else by our G-d the Lord.

Only G-d the Lord has the right to take your life,

nobody else.

**00:03:20**

**BK:** That is why everything will be okay. I am telling you that G-d

the Lord loves you, Oleg.

Because, G-d the Lord could have made this so that it

passed by me, knowing nothing.

**OM:** It is coincidence.

## Suggestion by Boris Kotlyarsky regarding participation with FBI

PO_0439 ·12/03/2015 · Meeting

BK: Listen to me carefully. There.

There is another option:

He brings him money, brings him a photo.

You both go to the cops to arrange for trap with

the cops.

0007 ·12/16/2015 · Phone call

00:09:40

BK:Father in law had to get hard labor.

00:11:30

To be right is to conduct a setup and he will then

get a hard labor.

00:18:38-00:18:55

BK: For Tolya it will be final verdict.

How should it end the way I told you with hard

labor for Tolya.

00:19:00

The police will believe it if a person like Borya will tell

them that somebody approached him with such offer.

They will trust him and they will set this all up.

00:30:00

BK: Borya knows that I know, right, for Borya to do

the job, he will know that I know who did it for Borya.
00:30:23

OM: But he knows that you wouldn't go to the

government anyway.
00:30:27

BK: What, I will go for sure. For sure I will go.
00:30:45

BK: If he decides to do the job with you without

me knowing, then the second job, he must do

against me.
00:30:56

OM: But we are not relatives. Thank you for helping me.
00:35:10-00:35:20

BK: If he was planning to do this job what was the

reason for him to tell me about it?

What the reason to tell me about it?
00:36:50

BK: And this will be stage a trap, will be a trap.
00:37:00

BK: When Tolya will give the final payment.

BK: If it will go that way, when Tolya will bring the

final payment then Tolya will be arrested.

**BK:** They will arrest Tolya, and you, everything will be done without you.

They have producers who know how to stage this show, and when everything will be over this one will be arrested and that is it.

0016 · 01/04/2015 · Phone call

00:02:20

**BK:** It should be solved once and for all

Stop, to stop the way that I already told you to set him up.

00:03:26

**OM:** Where should we go? Simple to go to the police?

00:04:00

**BK:** I have no idea. I never done this in my life.

I don't think that it will be regular precinct.

I would think the Federal Plaza

**OM:** Federal Plaza

**BK:** Of course

**0025 · 01/09/2016 · Phone call**
**00:11:25**
**BK: They got in contact with the FBI here and**

**produced the show.**

1

# Government Summary Findings
0016-01-04-2016
FBI – Verbatim translation
**Name and office of linguist – CL Anton Masterovoy NYO**
**Task # and date completed: 532559 – 4/29/2016**
**Requesting official – SA Luke Hardison, CD-24**

**Synopsis 1 – PO_0294**
**BL (BK) tells OM that what his relative has requested will not**

**happen on Borya's end.**

**BL (BK) tells OM that this must be resolved once and for all by**

**making an arrangement.**

**BL (BK) will call OM, introduce them, and they will resolve their**

**issue.**

**BL (BK) says that UM (BN) will be glad to cooperate**

**with the government.**

**BL (BK) tells OM that in order to do that, one would**

**have to go to federal plaza, rather than a regular**

**police precinct!**

1

## Extortion
## Financial Interest
## 0021 – 01/07/2016

PO_0342

**BK: Olezhka, I am not interested in this.**

**I don't have any financial interest here at all.**

OM: I know, I am not even thinking about that.

**BK: And there can't be one.**

**I would have stopped respecting myself if my financial**

**interest was even one penny!**

PO_0345

**BK: For me I don't need that in a hundred years.**

**I don't have any interest here.**

If you were tell me; "Borya I am not interested in all that, goodbye,

goodbye, then.

**OM: If he were to go to jail, it is worth any kind of**

**money.**

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 4, 2017

**BY ECF AND BY HAND**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States* v. *Boris Kotlyarsky,*
       16 Cr. 215 (LAK)

Dear Judge Kaplan:

The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for May 11, 2017. For the reasons explained below, the Government submits that a sentence within the applicable Guidelines range of 41 to 51 months' imprisonment is fair and appropriate in this case.

**A. Factual Background**

**Background**

Around June 2015, Anatoly Potik introduced the defendant to Boris Nayfeld, a well-known member of Russian organized crime groups with a reputation for violence. (*See* October 27, 2016 Plea Transcript ("Tr.") at 17:16-18.) After their initial meeting at the restaurant, Kotlyarsky and Nayfeld remained in contact throughout the summer by telephone and in person. Kotlyarsky learned that Nayfeld was destitute and looking ways to make money.

In the early fall, Nayfeld told Kotlyarsky a shocking story: Potik had proposed that Nayfeld murder, or arrange for the murder, of an unidentified person. From Nayfeld's description, the defendant identified the intended victim as Potik's son-in-law (the "Victim"). (Tr. 16:22-17:15.) Kotlyarsky told Nayfeld that the Victim was a wealthy person and a good person, and that the Victim would likely be willing to pay Nayfeld if Kotlyarsky and Nayfeld were to tell him about the threat to his life. Kotlyarsky did not report the murder plot to the authorities.

On October 31, 2015, Kotlyarsky met the Victim at a restaurant in Brooklyn, New York. At the meeting, Kotlyarsky informed the Victim, in substance and in part, that the Victim's father-in-law had approached Nayfeld with a contract to kill the Victim in exchange for a $100,000 payment. Kotlyarsky offered to broker a meeting between the Victim and Nayfeld. At the time, the Victim understood Kotlyarsky to be offering the Victim an opportunity to intercede with Nayfeld before

about January 7, 2016, begun at approximately 3:36:33 p.m., the defendant told the Victim the following:

> BK:           [OV] It's 1pm, [Victim]. Come, if you want to.
>
> [UI background conversation]
>
> Victim:      All right, I understand. But I think that this—I'll come—but I think that it's very odd, because if he took the money, and there would be some lads there, I might not manage—
>
> BK:           But there won't be any—well, fuck! Well, you can make one snap. Listen to me: Do what you like. I told you, come at 1pm if you like, you'll sit down and finish everything up.
>
> Victim:      [breathes loudly] I understand.
>
> BK:           If you want to. If you don't, don't co—say that, "Borya, I can't, I am busy" and that's it. As you wish.
>
> Victim:      I understand. Well, all right, I'll come, what can I do?
>
> BK:           It's your business, well—
>
> Victim:      Nah, well, I unde—I, I understand . Now what—I thought that he would take some money from him, in order to, er [UI]
>
> BK:           [OK] Yes, he is supposed to and he told him that, er, er, the deposit is a ruble fifty.

(See PSR ¶ 15.) Later, when the Victim inquired about "amounts" to be paid to Nayfeld, the defendant responded that "I don't know, I am not interes—I haven't even asked him" and "That's when you and him sit down, he'll tel—for me—now this where I shouldn't be and for me I don't need that in hundred years, because I don't have any interest here."

On or about January 8, 2016, the defendant and Nayfeld met the Victim at a restaurant in Brooklyn, New York ("Restaurant-2"). When the Victim entered Restaurant-2, the defendant and Nayfeld were already present, along with Nayfeld's son (the "Son"). The defendant introduced Nayfeld and the Victim to each other. Nayfeld and the Victim then sat at one table and conversed; the defendant and the Son sat at a nearby table. (PSR ¶ 17.) During the conversation, Nayfeld told the Victim that Potik had paid him $50,000 as partial payment to arrange for the Victim's murder. Nayfeld also relayed that Nayfeld had told Potik that the entire job would cost $250,000 and would take two persons. (PSR ¶ 18.)

After speaking to Nayfeld for approximately two hours, the Victim departed Restaurant-2. After the Victim departed, Nayfeld and the defendant departed together in an SUV driven by the defendant. (PSR ¶ 17.) Nayfeld reported the substance of his conversation with the Victim to the defendant.

On January 11, 2016, Kotlyarsky drove Nayfeld to a meeting a restaurant in Brooklyn. Nayfeld went inside the restaurant and met the Victim. Kotlyarsky met the Son and went with him inside a nearby restaurant. (PSR ¶ 19.)

During the January 11, 2016 meeting, Nayfeld told the Victim that the Victim was lucky Kotlyarsky intervened. Nayfeld also demanded immediate payment. (PSR ¶ 20.) For example:

BN:      [Victim, Victim] that doesn't do it justice. Thank God someone like Borya Kotlyarsky came into the picture, because if it wasn't for him... Basically what is the difference to me? There will be nothing earned with just the mind. Thank God it turned out this way. [Victim], I want to see everything already end for you, for you. [Victim,] the only thing is, this will cost you 125,000 because I have to give to the guys and something would be left for me.

Victim:   One hundred twenty five, by when, by when do you need it? May I, may I make a transfer? Or how do you want it?

BN:      Meaning what? It's already needed.

Victim:   It's already needed?

BN:      Yes, it's already needed. Do it, figure out how to do it. It's already needed.

After further discussion, Nayfeld and the Victim agreed that the Victim would pay Nayfeld's demand, with the first $50,000 by January 15, 2016.

On January 14, 2016, the Victim met Nayfeld at Restaurant-2. The Victim asked Nayfeld, in substance and in part, for assurances that the Victim would be safe. Nayfeld agreed to call Potik. The Victim dialed Potik's number on his own cellphone, and handed the cellphone to Nayfeld. Nayfeld said aloud, in substance and in part, do not touch the Victim or I will harm you. In Nayfeld's presence, the Victim wrote a check in the amount of $50,000 and signed it. The check did not specify a recipient. (PSR ¶ 20.)

Nayfeld departed Restaurant-2 with the check in his possession. Immediately after Nayfeld left Restaurant-3, law enforcement officers approached him. Nayfeld then uttered an expletive and tore up the check. (PSR ¶ 20.) The FBI arrested Nayfeld. Shortly after Nayfeld's arrest, Kotlyarsky arrived outside the restaurant. The FBI then arrested the defendant, too.

On January 28, 2016, Boris Kotlyarsky was ordered released from custody on conditions. While on release, the defendant attempted to shape or prevent Nayfeld testimony against him by (a) drafting an affidavit for Nayfeld's signature containing false and misleading statements that Nayfeld had merely attempted to sell the Victim information, (b) providing protected case documents to Nayfeld's son, (c) proposing that Kotlyarsky sue the Victim's family and share a portion of the recovery with Nayfeld's family, and (d) asking Nayfeld's son whether Nayfeld had thought about what his criminal associates in Russia would think if they learned that Nayfeld had

hON. bRETT kAVANAUGH STATEMENT IN HEARING "ALL CASES MUST BE DECIDED ONLY ON EVIDENCE PRESENTE

Brett Kavanaugh is an associate justice of the Supreme Court of the United States. ... Kavanaugh stopped hearing cases or issuing opinions on the D.C. Circuit while ... Kavanaugh issued the statement below after President Trump announced his ... A judge must be independent and must interpret the law, not make the law.

Missing: hON. EVIDENCE

## Images for hON. bRETT kAVANAUGH STATEMENT IN HEARING "ALL CASES MUST BE DECIDED ONLY ON EVIDENCE PRESENTED

   

→ More images for hON. bRETT kAVANAUGH STATEMENT IN HEARING "ALL CASES MUST BE DECIDED ONLY ON EVIDENCE PRESENTED          Report images

books.google.com › books
### The Examiner - Page 403 - Google Books Result
Lord Stanley is fond of striking a balance between statements and parties, and he ... must be in possession of all the resources of Persia, masters of Turkistan and of ... by conquering and occupying, not only Cabul and Candahar, but, even Herat, ... all other persons incur who do what is wrong; and the result is that we hear ...
1867

## Searches related to hON. bRETT kAVANAUGH STATEMENT IN HEARING "ALL CASES MUST BE DECIDED ONLY ON EVIDENCE PRESENTED

| | |
|---|---|
| brett kavanaugh hearing | brett kavanaugh christine blasey ford |
| christine blasey ford | christine blasey ford testimony |
| brett kavanaugh opening statement transcript | brett kavanaugh supreme court nomination |
| brett kavanaugh hearing opening statement | what happened to brett kavanaugh |

Previous     1  2  3  4  5     Next

11229, Brooklyn, NY - Based on your past activity - Use precise location - Learn more

Help     Send feedback     Privacy     Terms

000110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     INDICTMENT

            - v. -                :     S1 16 Cr. 215 (LAK)

BORIS KOTLYARSKY,                 :

            Defendant.            :

- - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 0 5 2016

### COUNT ONE

#### (Conspiracy to Commit Extortion)

The Grand Jury charges:

1.   From at least in or about June 2015, up to and
including at least in or about January 2016, in the Southern
District of New York and elsewhere, BORIS KOTLYARSKY, the
defendant, and others known and unknown, unlawfully and
knowingly combined, conspired, confederated, and agreed together
and with each other to violate Title 18, United States Code,
Section 1951.

2.   It was a part and object of the conspiracy that
BORIS KOTLYARSKY, the defendant, and others known and unknown,
unlawfully and knowingly, would and did obstruct, delay, and
affect commerce and the movement of articles and commodities in
commerce by extortion as that term is defined in Title 18,
United States Code, Section 1951, by obtaining money and
property from and with the consent of another person, which

District of New York and elsewhere, BORIS KOTLYARSKY, the

defendant, and others known and unknown, unlawfully and

knowingly committed and attempted to commit extortion, as that

term is defined in 18 U.S.C. § 1951(b)(2), by obtaining money

and property from and with the consent of another person, which

consent would have been and was induced by the wrongful use of

actual and threatened force, violence, and fear, and thereby

would and did obstruct, delay, and affect commerce and the

movement of articles and commodities in commerce, as that term

is defined in 18 U.S.C. § 1951(b)(3), and did aid and abet the

same, to wit, KOTLYARSKY, having informed Victim-1 that Victim-1

was the target of a murder plot, induced Victim-1 to pay CC-1 to

stop the plot.

(Title 18, United States Code, Section 1951 and 2.)

## COUNT THREE
### (Attempted Witness Tampering)

The Grand Jury further charges:

5.    From in or about February 2016 to in or about

September 2016, in the Southern District of New York and

elsewhere, BORIS KOTLYARSKY, the defendant, knowingly did use

intimidation, threaten, and corruptly persuade another person,

and attempt to do so, and engage in misleading conduct toward

another person, with intent to influence, delay, and prevent the

testimony of any person in an official proceeding, to wit,

3

000112

KOTLYARSKY, believing that CC-1 would testify against him at trial, contacted CC-1's relative to provide CC-1 with a false affidavit for CC-1 to sign and to encourage CC-1 not to testify by emphasizing that CC-1's reputation would be ruined and promising to sue Victim-1 and to share the expected monetary award with CC-1's family.

(Title 18, United States Code, Section 1512(b)(1).)

## FORFEITURE ALLEGATION

6.    As a result of committing the offenses alleged in Counts One and Two of this Indictment, BORIS KOTLYARSKY, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## Substitute Assets Provision

7.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

4

c.   has been placed beyond the jurisdiction of the
Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p) and Title 28, United States
Code, Section 2461(c), to seek forfeiture of any other property
of the defendant up to the value of the above forfeitable
property.

    (Title 18, United States Code, Section 981;
    Title 21, United States Code, Section 853; and
    Title 28, United States Code, Section 2461.)

_____
FOREPERSON

PREET BHARARA  NO+
United States Attorney

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         16 CR 215  (LAK)

 5   BORIS KOTLYARSKY,

 6                    Defendant.

 7   ------------------------------x

 8                                         New York, N.Y.
                                           October 13, 2016
 9            FALSE                        3:30 p.m.

10
     Before:
11
                     HON. LEWIS A. KAPLAN,
12
                                           District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ANDREW M. THOMAS
17        Assistant United States Attorney

18   LAW OFFICE OF DENNIS J. RING
          Attorneys for Defendant
19   DENNIS J. RING
          -and-
20   MIRVIS & ASSOCIATES, P.C.
          Attorneys for Defendant
21   TONY MIRVIS

22   ALSO PRESENT:  Special Agent Luke Hardison, FBI
     Paralegal Specialist Nicholas Pablis, USAO
23

24

25
```

**AFFIDAVIT**

FALSE

THE STATE OF NEW YORK )
         ) S.S.
COUNTY OF NEW YORK )

I, Boris Nayfeld, of Staten Island, New York, being duly sworn, deposes and says:

1. I met with Oleg Mitnik on or about January 8, 2015, January 11, 2015 and January 14, 2015.

2. During the course of the meetings I provided Oleg Mitnik with information regarding his father-in-law, Anatoly Potik.

3. Oleg Mitnik offered to pay me and I received a check for $50,000.00 from Oleg Mitnik for the information I provided to Oleg Mitnik regarding Anatoly Potik.

FALSE

            _____
            BORIS NAYFELD

SUBSCRIBED AND SWORN TO
BEFORE ME, on the
____ day of March, 2016

_____
NOTARY PUBLIC

My Commission expires: _____

000116

# FALSE

c.   has been placed beyond the jurisdiction of the

Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of the defendant up to the value of the above forfeitable

property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

5

000117

# AFFIDAVIT

THE STATE OF NEW YORK     )
                                            ) S.S.
COUNTY OF NEW YORK     )

I, Boris Nayfeld, of Staten Island, New York, being duly sworn, deposes and says:

1.     I met with Oleg Mitnik on or about January 8, 2016, January 11, 2016 and January 14, 2016.

2.     During the course of the meetings I provided Oleg Mitnik with information regarding his father-in-law, Anatoly Potik

3.     Oleg Mitnik offered to pay me and I received a check for $50,000.00 from Oleg Mitnik for the information I provided to Oleg Mitnik regarding Anatoly Potik.



_____
BORIS NAYFELD

SUBSCRIBED AND SWORN TO
BEFORE ME, on the
___ day of March, 2016



_____
NOTARY PUBLIC

My Commission expires: _____

**scans**

Staples Copy Center #188

**Sent:** Saturday, May 07, 2016 1:35 PM
**To:** frank@fassonelaw.com
**Attachments:** frank.PDF (540 KB)

Thank You
StaplesCopy & Print #0188
2982 Ocean Ave
Brooklyn, NY 11235
(718) 743-8238 phone
(718) 743-2673 fax
cc0188@staplescopycenter.com

000119

0011·0024·0015·4100
$1500
Home 1·800·347·2883·
Collear 011·1·801·902·3100

Name 1- 916·149·500?
Address

Home                    Work
EdELMANS
1-80·-520-1440
Name LESLEY ANN BEHDRO PT
Address 1312 KINGS HWY 2ND FLOOR
BROOKLYN, N.Y. 11229
Home
732·616·5652 BEH9
716-839·3037 Unes
Name
Address          GENUINE
FRANK TASSONE ESQ
Home FRANK@TASSONELAW.COM
904·4033728
904·610·2449
Name HEIDI GUZMAN "Parac
Address 212·477·8793
CRISTIAN VINTILA
Home E-M VIOREL POPESCU1951@
YAHOO·COM /0047·22·236287
004 923·49054/732·236

000120



Dinae Kaddy 917-838-3500
Dinaart198@GMAIL.COM

Baryn Nasroo Bela 845-286-6384
161 Nereid Ave St. NY 10308 Apt 1B
Whee Angel 718-974-5552
Fame Thorne 504-463-728
                 504-696-2423

**GENUINE**

Melis Jennil 917-533-5089
Bane's Jennil 917-520-8473

Zurina Vargas - Madison Estates
office 718-975-9625 Cell 917-710-1241
Zvargas@madisonestates.com

H
I
J
K
L
M
N
O
P
Q
R
S
T
U
V
W
X Y Z



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 22, 2016

BY EMAIL
Dennis J. Ring
Law Office of Dennis J. Ring
148-29 Cross Island Parkway
Whitestone, NY 11357

Re: *United States v. Boris Kotlyarsky,*
S1 16 Cr. 215 (LAK)

Dear Mr. Ring:

This document is not a plea agreement. Rather, pursuant to the suggestion of the Court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), this letter sets forth the current position of the United States Attorney's Office for the Southern District of New York (the "Office") regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to defendant Boris Kotlyarsky (the "defendant") in this case.

The Indictment charges the defendant in three Counts.

Count One charges the defendant with conspiring to commit Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

Count Two charges the defendant with committing Hobbs Act extortion, in violation of Title 18, United States Code, Sections 1951 and 2, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

Count Three charges the defendant with witness tampering, in violation of Title 18, United States Code, Section 1512(b), and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine of $250,000, and a $100 mandatory special assessment.

The maximum sentence of incarceration on all counts is 60 years' imprisonment.

05.10.2018

introduced me to Kotlyarsky. Kotlyarsky hired me to collect his debts in Russia. He was counting on my reputation and my connections with other representatives of organized crime and my connections in Russia because these individuals were afraid of me.

THE COURT: Oh, the headset. Does the government believe that there is a sufficient factual predicate for a plea of guilty should the defendant choose to enter one?

MR. THOMAS: Yes, your Honor. The government would suggest one additional question with respect to the conspiracy. That question would be whether or not Mr. Nayfeld, Mr. Potik, and Mr. Kotlyarsky agreed that as part of Mr. Nayfeld's efforts to collect debts on their behalf that unlawful pressure would be used, if necessary.

THE COURT: The only way I can do that is to connect Mr. Mitnik to the debt, right? Because this is, as I understand it, the conspiracy that is charged is in connection with Victim 1 so it has to be not just that he would use force to collect a debt but that he would use force to collect the debt from Mr. Mitnik, otherwise I think that you have got what you need on the -- you have the conspiracy to commit extortion, you have extortion, and so I am a little -- but I am confused by what else you want that's not going to get us more confused.

MR. THOMAS: Your Honor, I think the Court's suggestion is excellent and I agree that the allocution is sufficient to state both charges. I only observe, for the Court's information, that the superseding information charges a conspiracy with three separate objects. One object is the extortion of Mr. Mitnik. The other objects are the other business endeavors Mr. Kotlyarsky, Nayfeld, and Potik pursued which were themselves extortionate. (Nayfeld plea at pp. 49-50).

As you can see, this was a carefully planned and well orchestrated effort to hide the alleged extortion of "Armand" among the over-riding allegations concerning the murder conspiracy extortion.

So with these facts in mind – let's talk

12. Because the defendant committed an offense while on pretrial release, the offense level increases by three points pursuant to U.S.S.G. § 3C1.3.

13. Accordingly, the Guidelines offense level for Group One is 27.

*Group Two*

14. Group Two involved the exploitation of a person's fear of bodily injury or death. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.

15. Because the offense involved the express or implied threat of death, bodily injury, or kidnapping, pursuant to U.S.S.G. § 2B3.2(b)(1), the offense level increases by two levels.

16. Because the amount to be demanded of the victims exceeded $9,500,000 in total, pursuant to U.S.S.G. § 2B3.2(b)(2) and U.S.S.G. § 2B3.1(b)(7)(H), the offense level increases by seven levels.

17. Accordingly, the Guidelines offense level for Group Two is 27.

*Combined Offense Level*

18. Group One and Group Two have equivalent offense levels. Accordingly, pursuant to U.S.S.G. § 3D1.4, Group One and Group Two each receive one Unit. Pursuant to U.S.S.G. § 3D1.4, two Units corresponds to a two-level increase in the offense level.

19. The defendant obstructed justice in connection with the prosecution. Therefore, pursuant to U.S.S.G. § 3E1.1 n.4, the defendant receives no acceptance of responsibility points.

In accordance with the above, the applicable Guidelines offense level is 29.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has three criminal history points, calculated as follows:

1. On or about April 11, 2001, the defendant was convicted in the U.S. District Court for the Southern District of New York of money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h), resulting in a sentence of eighteen months' imprisonment and two years' supervised release. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points.

In accordance with the above, the defendant's Criminal History Category is II.

05.10.2016



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 25, 2016

**BY EMAIL**

Dennis J. Ring
Law Office of Dennis J. Ring
148-29 Cross Island Parkway
Whitestone, NY 11357

    Re: *United States v. Boris Kotlyarsky,*
      S1 16 Cr. 215 (LAK )

Dear Mr. Ring:

    Enclosed please find a proposed plea agreement, which constitutes a plea offer that you should communicate to your client promptly. This proposed plea agreement contains all the terms of the Government's plea offer, and it supersedes any prior plea offers that the Government may have made and any previous plea discussions with the Government. This plea offer expires at the end of the business day on October 26, 2016 and may be revoked by the Government, in its sole discretion, at any time before its expiration. If your client rejects the plea offer and proceeds to trial, your client's sentencing exposure under the relevant statutes and the Sentencing Guidelines is likely to be higher after trial than the periods of imprisonment specified in the enclosed proposed plea agreement.

                      Very truly yours,

                      PREET BHARARA
                      United States Attorney

    by:                              
                      Andrew Thomas
                      Assistant United States Attorney
                      (212) 637-2106

000126

FALSE

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 25, 2016

**BY EMAIL**

Dennis J. Ring
Law Office of Dennis J. Ring
148-29 Cross Island Parkway
Whitestone, NY 11357

FALSE

Re: *United States v. Boris Kotlyarsky,*
S1 16 Cr. 215 (LAK)

Dear Mr. Ring:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from defendant Boris Kotlyarsky ("the defendant") to Count One of the above-referenced Indictment. Count One charges the defendant with conspiring to commit two Hobbs Act extortion offenses, in violation of Title 18, United States Code, Sections 1951 and 2, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for his participation in a conspiracy to commit extortion with respect to (a) a murder-for-hire plot and (b) the recovery of his business interests in Russia, as charged in Count One, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

Rev. 07.20.2016

introduced me to Kotlyarsky. Kotlyarsky hired me to collect his debts in Russia. He was counting on my reputation and my connections with other representatives of organized crime and my connections in Russia because these individuals were afraid of me.

THE COURT: Oh, the headset. Does the government believe that there is a sufficient factual predicate for a plea of guilty should the defendant choose to enter one?

MR. THOMAS: Yes, your Honor. The government would suggest one additional question with respect to the conspiracy. That question would be whether or not Mr. Nayfeld, Mr. Potik, and Mr. Kotlyarsky agreed that as part of Mr. Nayfeld's efforts to collect debts on their behalf that unlawful pressure would be used, if necessary.

THE COURT: The only way I can do that is to connect Mr. Mitnik to the debt, right? Because this is, as I understand it, the conspiracy that is charged is in connection with Victim 1 so it has to be not just that he would use force to collect a debt but that he would use force to collect the debt from Mr. Mitnik, otherwise I think that you have got what you need on the -- you have the conspiracy to commit extortion, you have extortion, and so I am a little -- but I am confused by what else you want that's not going to get us more confused.

MR. THOMAS: Your Honor, I think the Court's suggestion is excellent and I agree that the allocution is sufficient to state both charges. I only observe, for the Court's information, that the superseding information charges a conspiracy with three separate objects. One object is the extortion of Mr. Mitnik. The other objects are the other business endeavors Mr. Kotlyarsky, Nayfeld, and Potik pursued which were themselves extortionate. (Nayfeld plea at pp. 49-50).

As you can see, this was a carefully planned and well orchestrated effort to hide the alleged extortion of "Armand" among the over-riding allegations concerning the murder conspiracy extortion.

So with these facts in mind – let's talk

000129

A. Offense Level

1.  The applicable Guidelines Manual is the November 1, 2015 Guidelines Manual.

2.  Count One charges a conspiracy to commit two Hobbs Act extortion offenses: (a) the extortion of Victim-1, as identified in the Indictment ("Offense One"), and (b) the use of extortion to reclaim the defendant's business interests in Russia ("Offense Two").

3.  Offense One and Offense Two are treated as a separate conspiracy counts pursuant to U.S.S.G. § 1B1.1 and subject to multiple-count analysis pursuant to U.S.S.G. § 3D1.1.

4.  Pursuant to § 3D1.2, Offense One and Offense Two comprise separate groups.

*Offense One*

5.  Offense One involved the exploitation of a person's fear of bodily injury or death. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.

6.  Because the offense involved the express or implied threat of death, bodily injury, or kidnapping, pursuant to U.S.S.G. § 2B3.2(b)(1), the offense level increases by two levels.

7.  Because the amount to be demanded of the victims exceeded $95,000, but was less than $500,000, in total, pursuant to U.S.S.G. § 2B3.2(b)(2) and U.S.S.G. § 2B3.1(b)(7)(C), the offense level increases by two levels.

8.  Because the defendant attempted to unlawfully influence the testimony of a potential witness in an official proceeding, pursuant to U.S.S.G. § 3C1.1 and U.S.S.G. § 2J1.2, the offense level increases by two levels.

9.  Accordingly, the Guidelines offense level for Group One is 24.

*Offense Two*

10. Group Two involved the exploitation of a person's fear of bodily injury or death. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.

11. Because the offense involved the express or implied threat of death, bodily injury, or kidnapping, pursuant to U.S.S.G. § 2B3.2(b)(1), the offense level increases by two levels.

12. Because the amount to be demanded of the victims exceeded $9,500,000 in total, pursuant to U.S.S.G. § 2B3.2(b)(2) and U.S.S.G. § 2B3.1(b)(7)(H), the offense level increases by seven levels.

13. Accordingly, the Guidelines offense level for Group Two is 27.

Rev. 07.20.2016

000130

# FALSE

*Combined Offense Level*

14. Offense Two has the higher offense level, so it receives one Unit pursuant to U.S.S.G. § 3D1.4. Because Offense One is within four levels of Offense Two, Offense One receives one Unit. Pursuant to U.S.S.G. § 3D1.4, two Units corresponds to a two-level increase in the offense level for Offense Two. Accordingly, the combined offense level for Offense One and Offense Two is 29.

15. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 26.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has three criminal history points, calculated as follows:

1. On or about April 11, 2001, the defendant was convicted in the U.S. District Court for the Southern District of New York of money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h), resulting in a sentence of eighteen months' imprisonment and two years' supervised release. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points.

In accordance with the above, the defendant's Criminal History Category is II.

C. Sentencing Range

# FALSE

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 70 to 87 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 26, the applicable fine range is $25,000 to $250,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, see U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 70 to 87 months' imprisonment and (ii) that the Government will not appeal any sentence within or



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 26, 2016

**BY EMAIL**

Dennis J. Ring
Law Office of Dennis J. Ring
148-29 Cross Island Parkway
Whitestone, NY 11357

    Re: *United States v. Boris Kotlyarsky*,
       16 Cr. 215 (LAK.)

Dear Mr. Ring:

    On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from defendant Boris Kotlyarsky ("the defendant") to Counts One and Two of the above-referenced Indictment.

    Count One charges the defendant with conspiring to commit Hobbs Act extortion, in violation of Title 18, United States Code, Sections 1951 and 2, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

    Count Two charges the defendant with committing Hobbs Act extortion, in violation of Title 18, United States Code, Sections 1951 and 2, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

    The maximum sentence of incarceration on Counts One and Two is 40 years' imprisonment.

    In consideration of the defendant's plea to the above offenses, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for (a) conspiring or agreeing to commit extortion with respect to a murder-for-hire plot, as charged in Counts One, and (b) committing or aiding and abetting the commission of extortion with respect to a murder-for-hire

Rev. 07/20/2016

A. Offense Level

1.    The applicable Guidelines Manual is the November 1, 2015 Guidelines Manual.

2.    Count One charges a conspiracy to commit two Hobbs Act extortion offenses: (a) the extortion of Victim-1, as identified in the Indictment ("Offense One"), and (b) the use of extortion to reclaim the defendant's business interests in Russia ("Offense Two").

3.    Offense One and Offense Two are treated as a separate conspiracy counts pursuant to U.S.S.G. § 1B1.1 and subject to multiple-count analysis pursuant to U.S.S.G. § 3D1.1.

4.    Pursuant to § 3D1.2, Offense One and Offense Two comprise separate groups.

*Offense One*

5.    Offense One involved the exploitation of a person's fear of bodily injury or death. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.

6.    Because the offense involved the express or implied threat of death, bodily injury, or kidnapping, pursuant to U.S.S.G. § 2B3.2(b)(1), the offense level increases by two levels.

7.    Because the amount to be demanded of the victims exceeded $95,000, but was less than $500,000, in total, pursuant to U.S.S.G. § 2B3.2(b)(2) and U.S.S.G. § 2B3.1(b)(7)(C), the offense level increases by two levels.

8.    Because the defendant attempted to unlawfully influence the testimony of a potential witness in an official proceeding, pursuant to U.S.S.G. § 3C1.1 and U.S.S.G. § 2J1.2, the offense level increases by two levels.

9.    Accordingly, the Guidelines offense level for Group One is 24.

*Offense Two*

10.  Group Two involved the exploitation of a person's fear of bodily injury or death. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.

11.  Because the offense involved the express or implied threat of death, bodily injury, or kidnapping, pursuant to U.S.S.G. § 2B3.2(b)(1), the offense level increases by two levels.

12.  Because the amount to be demanded of the victims exceeded $9,500,000 in total, pursuant to U.S.S.G. § 2B3.2(b)(2) and U.S.S.G. § 2B3.1(b)(7)(H), the offense level increases by seven levels.

13.  Accordingly, the Guidelines offense level for Group Two is 27.

*Combined Offense Level*

14. Offense Two has the higher offense level, so it receives one Unit pursuant to U.S.S.G. § 3D1.4. Because Offense One is within four levels of Offense Two, Offense One receives one Unit. Pursuant to U.S.S.G. § 3D1.4, two Units corresponds to a two-level increase in the offense level for Offense Two. Accordingly, the combined offense level for Offense One and Offense Two is 29.

15. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 26.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has three criminal history points, calculated as follows:

1. On or about April 11, 2001, the defendant was convicted in the U.S. District Court for the Southern District of New York of money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h), resulting in a sentence of eighteen months' imprisonment and two years' supervised release. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points.

In accordance with the above, the defendant's Criminal History Category is II.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines Range is 70 to 87 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 26, the applicable fine range is $25,000 to $250,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

000135

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

PREET BHARARA
United States Attorney

By: _____
Andrew Thomas
Assistant United States Attorney
(212) 637-2106

APPROVED:

_____
Nola B. Heller
Chief, Violent & Organized Crime Unit

AGREED AND CONSENTED TO:

_____          _____
Boris Kotlyarsky                              DATE

APPROVED:

_____          _____
Dennis J. Ring, Esq.                          DATE
Attorney for Boris Kotlyarsky

Rev. 07.20.2016

41-51

ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant acknowledges that he has discussed the possible immigration consequences (including deportation) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation from the United States. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including deportation) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Rev. 07.20.2016

000137

GARMKOTP                                                                    1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              16 Cr. 215 (LAK)

5   BORIS KOTLYARSKY,

6              Defendant.

7   ------------------------------x

8                                             New York, N.Y.
                                              October 27, 2016
9                                             11:30 a.m.

10

11  Before:

                    HON. KEVIN N. FOX,

12                                     Magistrate Judge

13

14                        APPEARANCES

15  PREET BHARARA
          United States Attorney for the
16        Southern District of New York
    ANDREW M. THOMAS
17        Assistant United States Attorney

18  DENNIS RING
          Attorney for Defendant

19

20

21  ALSO PRESENT:  LUKE HARDISON, FBI

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300



Scheme By

US Attorney Preet Bharara!

**False! - 10/27/2016 - Press release by US Attorney Preet Bharara!**
- **Evidence supports** that this press release was misleading and false!
- **01/07/2016** - Gov. Dkt. #58 - filed 05/04/2017 - Page 5 of 10
- **01/14/2016** - Video Post Arrest Statements by Mr. Kotlyarsky
- **10/27/2016** - Mr. Kotlyarsky's Allocution

**Page 14 - Lines 22-23:**

Mr. Kotlyarsky: Restitution? No financial gain for me was in this at all, Not one penny!

**Page 17 - Lines 19-25:**

Mr. Kotlyarsky: I did not know how much money Nayfeld would demand. I would not expect TO BE PAID any portion of money Nayfeld would try to obtain from Mitnik. There was NO financial gain for me at all! **I have since learned that Nayfeld told Mitnik $125,000 and on January 14, Mitnik paid Nayfeld $50,000 with a check, I later learned! I didn't know that it was going to happen at that meeting.**

**Page 18 - Lines 4-5 + Lines 13-14:**

Mr. Kotlyarsky: **I want to prevent the tragedy and save human being life! There is NO financial or any gain for me was in this case!**

**Page 18 - Lines 22-24:**

The Court: A demand for money was made of $125,000 and $50,000 was paid with respect to this demand.

**Page 18 - Line 25; Page 19 - Line 1 + Lines 21-25:**

Mr. Kotlyarsky: Yes, but **I didn't know about $125,000!** I arrange meeting because of ask him many times Oleg Mitnik he want to see this guy. **It is on the request of Oleg Mitnik this meeting was arranged!** It happend in Brooklyn. ( Gov. Dkt. #58 - 05/04/2017 - Page 5 of 10 - 01/07/2016 )

Page 1

GARMKOTP                                                        14

1           THE DEFENDANT:  Yes, your Honor.

2           THE COURT:  Did you have an opportunity to review the

3    document with your attorney?

4           THE DEFENDANT:  Yes, your Honor.

5           THE COURT:  Is there anything contained in the October

6    26, 2016 writing that you do not understand?

7           THE DEFENDANT:  No, your Honor.

8           THE COURT:  Among other things, the October 26, 2016

9    writing contains an analysis of how the sentencing commission

10   guidelines might apply to your case.  Are you aware of that,

11   sir?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Do you understand that notwithstanding the

14   analysis of the guidelines in the October 26, 2016 writing, the

15   impact, if any, that the sentencing commission guidelines may

16   have on the sentence to be imposed upon you is left solely to

17   the discretion of the sentencing judge?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  There is text in that same document to

20   which you agree to make restitution in connection with this

21   case.  Are you aware of that, sir?

22          THE DEFENDANT:  Restitution?  No financial gain for me

23   was in this at all, not one penny.  Yes, your Honor.

24          THE COURT:  I want to be clear about what your answer

25   is to my question.  The document, the October 26, 2016

1  Mitnik because of dispute over $20 million divorce case.

2      I knew Oleg Mitnik for many years.  At one time I want

3  Oleg Mitnik to marry my daughter, who sits here in the room,

4  and I inform Boris Nayfeld of this.  I did not want to see

5  Mitnik harmed. *To Be harmed.*

6      On October 31, 2015, I met with Mitnik and informed

7  him that I believed Nayfeld had been hired by Potik to kill

8  son-in-law, Oleg Mitnik.

9      It was later confirmed to me that indeed it was Mitnik

10 who Potik had hired Nayfeld to kill Potik's son-in-law, Anatoly

11 Potik, person who wants to kill his son-in-law.

12     I agreed with Nayfeld to introduce him and set up

13 meeting with him and Mitnik, during which I suspect Nayfeld

14 would demand money from Mitnik so that Nayfeld would not carry

15 through his agreement with Potik.

16     I suspect that due to Nayfeld criminal reputation,

17 Mitnik would fear Nayfeld and would likely pay Mitnik the money

18 he demanded.

19     Prior to Nayfeld meeting Mitnik, I did not know how

20 much money Nayfeld would demand.  I would not expect to be paid

21 any portion of the money Nayfeld would try to obtain from

22 Mitnik.  There was no financial gain for me at all.

23     I have since learned that Nayfeld told Mitnik 125,000

24 and on January 14, Mitnik paid Nayfeld $50,000 with a check.  I

25 learned later.  I didn't knew that it was going to happen that

GARMKOTP                                                          18

1    they meeting.

2          I know Mitnik did so out of fear that if he did not,

3    Nayfeld might follow through on his agreement with Potik to

4    kill Mitnik.  I want to prevent the tragedy and save human

5    being lives.

6          My actions aided and abetted Nayfeld in obtaining

7    money from Mitnik in this way.

8          I also know that this payment potentially affected

9    interstate commerce in that Mitnik had a business based in New

10   Jersey and the meetings with Mitnik and Nayfeld took place in

11   Brooklyn, New York.

12         That's it, your Honor.  I'm sorry one more time.

13   There is no financial or any other gain for me was in this

14   case.

15         THE COURT:  If I understood you correctly, you learned

16   that a person's son-in-law was to be killed and you agreed to

17   set up a meeting where you suspected that an agreement would be

18   made to prevent that killing for a demand of money.  Is that

19   correct?

20         THE DEFENDANT:  I suspect, yes, sir.  Yes, your Honor.

21   I'm sorry.

22         THE COURT:  A demand for money was made of $125,000

23.  and $50,000 was paid with respect to that demand, if I

24   understood you correctly.

25         THE DEFENDANT:  Yes.  But I didn't know about

Case 22-2750, Document 65, 08/30/2023, 3563522, Page132 of 157

000142

1    $125,000.

2          THE COURT:  And you aided and abetted the receipt of

3    that money, if I understood what you said correctly.  Is that

4    right?

5          THE DEFENDANT:  The answer is yes.

6          THE COURT:  And because of the locations of the

7    persons involved and their travel, this arrangement affected

8    interstate commerce, if I understood you correctly, someone

9    traveled from New Jersey --

10         THE DEFENDANT:  Yes, sir.  I did not -- his business

11   was in New Jersey, but he live in New York.  Yeah.  I take full

12   responsibility.  I'm nervous.  I'm sorry, your Honor.  I

13   understood that it could affect interstate commerce.

14         THE COURT:  When you engaged in the activities that

15   you have just been describing, did you know that what you were

16   doing was wrong?

17         THE DEFENDANT:  Yes.  The answer is yes.

18         THE COURT:  The meeting that you arranged where there

19   would be a discussion about preventing the killing of someone's

20   son-in-law, where did that occur?

21         THE DEFENDANT:  Meeting that I arrange happened in

22   Brooklyn, but I arrange meeting because of ask him many times

23   of Oleg Mitnik.  He want to see this guy.  Where it happen.  In

24   Brooklyn.  It's on the request of Oleg Mitnik, this meeting was

25   arranged.  It happened in Brooklyn.  I'm sorry.

An official website of the United States Department of Justice

# THE UNITED STATES ATTORNEY'S OFFICE
## SOUTHERN DISTRICT *of* NEW YORK

### Department of Justice
### U.S. Attorney's Office
### Southern District of New York

FOR IMMEDIATE RELEASE                      Thursday, October 27, 2016

# Brooklyn Man Pleads Guilty To Extorting Payment From Victim To Stop Murder Plot

Preet Bharara, the United States Attorney for the Southern District of New York announced that BORIS KOTLYARSKY pled guilty to extortion conspiracy and extortion in connection with a scheme to extract payment from a person who believed that he was the subject of a murder-for-hire plot. KOTLYARSKY pled guilty this morning in Manhattan federal court before U.S. Magistrate Judge Kevin Nathaniel Fox.

Manhattan U.S. Attorney Preet Bharara said: "As Boris Kotlyarsky has admitted, he took cruel advantage of a desperate situation, giving a victim the extortionate choice between paying off his hitman or death. Kotlyarsky's manipulation did not result in a payoff, but instead a criminal conviction."

According to the allegations in the charging documents, including the Complaint and Indictment, and statements made in court proceedings:

In October 2015, KOTLYARSKY's associate ("CC-1"), who has extensive connections to Russian organized crime, told KOTLYARSKY that a Russian businessman (the "Businessman") had approached CC-1 with a contract to kill the Businessman's son-in-law (the "Victim") in exchange for payment.

CC-1 did not know the identity of the Victim. KOTLYARSKY, however, informed CC-1 of the identity of the Victim, told CC-1 that the Victim was wealthy, and offered to broker a meeting between the Victim and CC-1 so that the Victim could negotiate a payment to CC-1 to avoid harm.

Between October 2015 through January 14, 2016, KOTLYARSKY repeatedly contacted the Victim and emphasized CC-1's reputation for violence and connections with organized crime. In January 2016, KOTLYARSKY arranged a series of meetings between the Victim and CC-1. During these meetings, CC-1 told the Victim, among other things, that it was fortunate that KOTLYARSKY had contacted CC-1, and that the Victim owed $125,000 to CC-1, with $50,000 due by January 15, 2016.

During a meeting on January 14, 2016, arranged by KOTLYARSKY, the Victim gave CC-1 a check for $50,000. Shortly after the meeting KOTLYARSKY and CC-1 were arrested.

*        *        *

KOTLYARSKY, 68, pled guilty to one count of conspiracy to commit Hobbs Act extortion, which carries a maximum sentence of 20 years in prison and a maximum fine of $250,000 or twice the gross gain or loss from the offense; and to one count of Hobbs Act extortion, which carries a maximum sentence of 20 years in prison and a maximum fine of $250,000 or twice the gross gain or loss from the offense.

The maximum potential sentences in this case are prescribed by Congress and are provided here for informational purposes only, as any sentences for the defendants will be determined by the judge.

Mr. Bharara praised the outstanding work of the FBI, U.S. Customs and Border Protection, and the NYPD for their investigative efforts and ongoing support and assistance with the case.

The prosecution of this case is being overseen by the Office's Violent and Organized Crime Unit. Assistant U.S. Attorney Andrew Thomas is in charge of the case.

**Topic(s):**
Violent Crime

**Component(s):**
USAO - New York, Southern

**Press Release Number:**
16-280

Updated October 27, 2016

METRO

# Man admits to canceling hit job in exchange for $125K

By Lia Eustachewich

October 28, 2016 | 2:08am



Oleg Mitnik
Stephen Yang

A Brooklyn man who brokered a deal in a twisted murder-for-hire plot pleaded guilty to extortion charges Thursday.

Boris Kotlyarsky admitted in Manhattan federal court that he convinced the target of the plot, Oleg Mitnik, to pay him and hit man Boris Nayfeld $125,000 to cancel the killing, which was ordered by Mitnik's father-in-law, Anatoly Potik.

ADVERTISING

Mitnik forked over a $50,000 down payment in January after Kotlyarsky repeatedly contacted him about Nayfeld's "reputation for violence and connections with organized crime," prosecutors said.

**SEE ALSO**



**Mob boss who spared millionaire's life will squeal on mobster cronies**

Kotlyarsky, 68, pleaded guilty to extortion and conspiracy to commit extortion, which each carry prison terms of up to 20 years.

But in a plea agreement with feds, he faces a sentence of between just over three to a little more than four years.

Kotlyarsky was set to begin trial in November.

"As Boris Kotlyarsky has admitted, he took cruel advantage of a desperate situation, giving a victim the extortionate choice between paying off his hit man or death," said US Attorney Preet Bharara in a statement.

Kotlyarsky's attorney didn't immediately comment.

FILED UNDER   EXTORTION, MANHATTAN FEDERAL COURT, MURDER, TRIALS

Recommended by

```
H5VYKOTS                                              1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        16 CR 215 (LAK)

5    BORIS KOTLYARSKY,

6                Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         May 31, 2017
9                                        2:35 p.m.

10
     Before:
11
                     HON. LEWIS A. KAPLAN,
12
                                         District Judge
13

14                        APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     MARK THOMAS
17        Assistant United States Attorney

18   DENNIS JOSEPH RING
          Attorney for Defendant
19             -AND-
     ENTIN & DELLA FERA, P.A.
20   BY:  ALVIN E. ENTIN
          Attorneys for Defendant
21   ALSO PRESENT:  LUKE HARDISON, FBI

22

23

24

25
```

H5VYKOTS                                                         3

1              I have received the presentence report, a sentencing

2    submission by the government dated May 4, a letter dated May 9

3    from Mr. Ring with attachments, a supplemental letter from both

4    counsel with an attachment -- that submission was filed

5    April 28 -- and a sentencing memorandum with attachments on

6    behalf of the defendant filed April 26.

7              Is there anything else of which I should be aware?

8              MR. THOMAS:  Nothing further from the government,

9    your Honor.

10             MR. ENTIN:  Not to my knowledge, your Honor.

11             THE COURT:  Whoever has prepared it, it is not exactly

12   the Richard Avedon of cat photography.  There we are.

13             Is there any victim present of the offenses of

14   conviction who wishes to be heard on sentence?

15             MR. THOMAS:  No, your Honor.

16             THE COURT:  Mr. Entin, I'll hear you.

17             MR. ENTIN:  Thank you, your Honor.

18             Thank you, your Honor, for accepting my admission in

19   this case pro hac vice.  It's always a pleasure when we

20   provincial lawyers from South Florida get an opportunity to

21   practice in the Southern District of New York, and I appreciate

22   the courtesy, your Honor.

23             THE COURT:  Your comment about provincial lawyers

24   reminds me -- and judging by the gray hairs in your head

25   probably will remind you when I mention it -- of another

1    police --

2              THE COURT:  Excuse me, Mr. Entin, just help me out in

3    one respect.

4              MR. ENTIN:  Yes, sir.

5              THE COURT:  I gather from some of the submissions that

6    at least one person in this triangle is regarded as being a

7    mobster, a Russian mobster.  Is that right?

8              MR. ENTIN:  That's my understanding, your Honor.

9    That's correct.

10             THE COURT:  Who is that?

11             MR. RING:  That's Mr. Nayfeld.

12             THE COURT:  Go ahead.

13             MR. ENTIN:  Mr. Kotlyarsky makes a mistake in judgment

14   as early as October and meets with the victim -- I think

15   everybody is calling him that.  I don't think we need to

16   mention his name -- and advises him that he believes, on the

17   basis of the information that he's received up to that point,

18   that his father-in-law was attempting to have him murdered and

19   that he believed, Mr. Kotlyarsky, that it might be a situation

20   that could be adjusted if and when it was necessary.

21             The government kindly put together a number of

22   transcripts, sections which it provided the Court in its

23   letter, which indicates that from that point in time in late

24   October until early January of 2016, whenever conversing with

25   Mr. Kotlyarsky, because the victim went to the police and

1    If I might read from the government's sentencing
2    letter, "As to control, Kotlyarsky chose to solve the victim's
3    problem himself rather than involve the authorities."
4         Well, the only problem that the victim would have had
5    that Mr. Kotlyarsky was attempting to improperly solve by
6    himself was the problem of his impending being killed.
7         As such, your Honor, when the motivation for the
8    individual involved in the extortion plot is a motivation to
9    save a life, coupled with the facts, your Honor, that he asked
10   for no money for himself directly from anyone and, in fact,
11   when offered a percentage by Mr. Nayfeld, turned it down.
12        THE COURT:  He pitched a business idea to the victim;
13   right?
14        MR. ENTIN:  Actually, that's not exactly 100 percent
15   correct.  What occurred was the victim told Mr. Kotlyarsky that
16   his businesses in St. Petersburg were losing money, and in
17   response to that in that conversation was, if you close those
18   businesses, perhaps you can meet with my son or son-in-law and
19   get involved with him in a business.  That was the extent of
20   pitching the business proposition.
21        It was not tied to, it was not dependent on, and it
22   was way after Mr. Kotlyarsky had actually come to the victim to
23   warn him of these impending difficulties.  So I don't think
24   that's 100 percent accurate.
25        Again, if Mr. Kotlyarsky was in this for money, he

1   would have easily taken a percentage from Mr. Nayfeld.  That

2   would have meant that the victim probably wouldn't have known

3   about that anyway.

4           He probably could have easily gotten away with that

5   and still pitched a deal, if that's what his intention was.  So

6   I would suggest, most respectfully, that his intention was a

7   good intention and not a bad intention.

8           I believe, because this is outside the heartland of

9   normal extortion cases, that a sentence below the guidelines

10  would be appropriate.  Then I think when your Honor looks at

11  the nature and characteristics of the defendant, as we point

12  out in our sentencing memorandum -- and I'm certainly not going

13  to belabor that.  I think it's rather extensive there -- but,

14  again, the Court knows that Mr. Kotlyarsky's wife suffers from

15  debilitating illnesses and that he is the sole caregiver for

16  her.

17          Your Honor has read the letters of recommendation from

18  his rabbi, from his children, from people that know him, all of

19  which attest to the fact that he's a charitable guy, he's a

20  good husband, he's been a great father, he's a wonderful

21  grandfather, and he cares for animals of the feline nature as

22  opposed to the K-9 nature, your Honor.

23          THE COURT:  You've been reading the papers.

24          MR. ENTIN:  We even get newspapers down in South

25  Florida.

H5VYKOTS                                                                    11

1              In any event, your Honor, the point I'm making is

2     we're going to ask the Court for a sentence below the

3     guidelines, and I think a sentence sufficient but not more than

4     necessary to recognize the seriousness of this offense would be

5     a sentence of 24 months in the following manner:

6              A sentence of 12 months and 1 day incarceration on the

7     extortion count and a sentence of 12 months' home confinement

8     on the obstruction count.  That would be a sentence

9     approximately 16 months below the guideline-recommended

10    41-month sentence.

11             But I would suggest to the Court that based upon what

12    his motivation was, based upon the fact that he didn't go into

13    this thing for any kind of pecuniary gain, based on the fact

14    that even the victim has spoken out for him on more than one

15    occasion, I would suggest that that would be an appropriate

16    sentence, recognizing the seriousness of the offense.

17             Let me just finish with this, your Honor:  If

18    Mr. Kotlyarsky, when he had heard what Mr. Nayfeld had to say

19    in his schvitz had done nothing, in his mind, he wouldn't be in

20    FDC in Brooklyn or sitting before your Honor today waiting to

21    be sentenced.  He would be home snuggled in the bosom of his

22    family, and the victim would be dead.  Thank you, your Honor.

23             THE COURT:  Thank you.

24             Mr. Kotlyarsky, you have the right to speak before you

25    are sentenced.

1           Is there anything you would like to say?

2           THE DEFENDANT: Yes, your Honor. Thank you.

3           Your Honor, thank you for the opportunity for me to

4     speak on my own behalf.

5           First and foremost, I take full responsibility of my

6     action. My sole purpose was to attempt to intervene and to

7     avoid a potential tragedy that I thought was on the verge of

8     happening.

9           I understand that my intention may have started as

10    honorable, but I am fully sorry for my poor judgment on how

11    they turned out. Furthermore, because of my action and poor

12    judgment, I have compiled more problems because additionally, I

13    have truly hurt my wife and children.

14          Me and my wife are 69-year-olds. We're married for

15    almost 42 years. My wife has arthritis and is dependent on my

16    assistance. I would like to get back with my wife as soon as

17    possible as it will be permitted by the law.

18          At 69, my wife and me -- we don't know how much time

19    God has in store for us. I would like to spend any given time

20    to me with my wife, my children, and my granddaughter.

21          I started working at 14 in 1961. In 2015, my wife and

22    me at 68 -- we enjoyed our retirement. I mostly enjoyed to

23    take my granddaughter to school, meet her after the school, and

24    to spend time with her on the weekend.

25          The only reason for me to intervene in this situation

1    was an attempt to prevent a tragedy and save the life of Oleg

2    Mitnik, nothing else, no financial or any gain for me. I was

3    very mad. I couldn't understand how father-in-law can deprive

4    his own grandchildren of having their father.

5         Once again, I accept responsibility. I only pray that

6    one day soon I can rejoin my family to take care of my wife and

7    to make my family whole again.

8         Thank you, your Honor, for any consideration you may

9    afford me. Thank you, your Honor.

10        THE COURT: Thank you. You may be seated.

11        I'll hear from the government.

12        MR. THOMAS: Yes, your Honor. I disagree with the

13   idea that the sole purpose of Mr. Kotlyarsky's intervention in

14   these affairs was to protect the victim.

15        As the presentence report and the sentencing

16   submissions by both sides and the facts themselves layout,

17   Mr. Kotlyarsky attempted to control and take advantage of this

18   situation from both sides, and he did it from the beginning.

19        Indeed, not only was this intervention not the reason

20   the victim is safe, but in intervening at all, Mr. Kotlyarsky

21   made it worse and, in fact, risked greater harm.

22        To break that down for the Court in terms of how that

23   may apply here at sentencing, the nature of this conduct is

24   that Mr. Kotlyarsky nurtured and then took advantage of a

25   person's specific fear of death.

1  the underlying events that lead to the original charge, sort or
2  speak to what it is that Mr. Kotlyarsky believes his role is
3  and what it is that he thinks that the judicial process is.
4          So, in light of those considerations, the government
5  is of the view that the sentencing range reflected by the
6  guidelines is a serious one and is certainly appropriate on
7  these facts, your Honor.  Thank you.
8          THE COURT:  Thank you.
9          Mr. Kotlyarsky, please rise for the imposition of
10 sentence.
11         For the reasons that are set out in the government's
12 letter and that Mr. Thomas has just ably summarized, I do not
13 accept that your conduct with respect to the extortion here was
14 quite as selfless as you and your lawyer have portrayed it.
15         You saw, in my judgment, a situation of which you
16 could take advantage, and you set about endeavoring to
17 structure matters so that at the end of the day, in one way or
18 another, there would be an economic benefit to you no matter
19 how it turned out.
20         Although I don't have specific evidence before me to
21 make an express finding -- and I don't -- it seems to me that
22 it would have been entirely reasonable to expect and,
23 notwithstanding what I said already, more likely than not that
24 you did expect that if Nayfeld was paid off, he would have
25 something for you out of the payoff.

1          I understand there's been no express testimony or

2     evidence that you and Nayfeld ever had a specific discussion or

3     understanding, but I do think the logic of the situation is

4     such that that was your intent and expectation.

5          Furthermore, you on more than one occasion discussed

6     with the victim the possibility of your doing business,

7     directly or indirectly, with the victim, which indicates that

8     you expected, in one way or another, that if the victim

9     survived this whole episode, there would be something in it for

10    you from that side.

11         So, even assuming for the sake of discussion that you

12    intervened in the first place with the goal of avoiding the

13    murder of the victim at the instance of Potik, I do think --

14    and I find -- that you did it, in part, out of the view that

15    you would and could benefit economically from that

16    intervention.

17         Now, that's all aside from your conduct once matters

18    got well down the road after you'd been arrested.  It's quite

19    clear that you did in fact obstruct justice in this case.

20         Indeed, there was no objection to the presentence

21    report's proposed finding on that count.  It's not a separate

22    count of the indictment, but it is a count here in a more

23    generic sense.  You did obstruct justice.

24         So the crimes are quite serious ones.  You conspired

25    to extort, you in fact committed extortion, you pleaded guilty

16 CR 213(LAK)

. The Government Witness information in exchange for money!
AUSA: Thomas hid the second case from the Court!!
**AUSA: Andrew Thomas - Lies and Inventions!**
**05/31/2017:**
      - Page 13-Line 13-25 - 100% Lie/Invented
      - Page 14-Line  1-25 - 100% Lie/Invented
      - Page 15-Line  1-25 - 100% Lie/Invented
      - Page 16-Line  1-25 - 100% Lie/Invented
      - Page 17-Line  1-7  - 100% Lie/Invented
There was not one piece of evidence, not one, presented by AUSA
Thomas through the entire case!

. **The Court: Not one piece of evidence!**
      - **Page 17-Line 20-21:** Although I don't have specific evidence
                    before me!
      - **Page 18-Line 1-2:** There's been no express testimony or evidence!
**The Court's sentence was based on:**
Hearsay - 1. A situation of which you could take advantage.
Hearsay - 2. One way of another there would be an economic benefit.
Hearsay - 3. It seems to me.
Hearsay - 4. It would have been entirely reasonable to expect.
Hearsay - 5. More likely then not.
Hearsay - 6. If Nayfeld was paid off he would have something for you.
Hearsay - 7. I do think the logic of the situation.
Hearsay - 8. That was your intent and expectation.
Hearsay - 9. You discussed the possibility of doing business.
Hearsay -10. You expected in one way or another.
Hearsay -11. Assuming for the sake of discussion.
Hearsay -12. You could benefit economically from that intervention.

**Honorable Lewis A. Kaplan was proven wrong from 1-12.**
      - His wrong conclusion was made because AUSA Thomas:
           - Sealed - Do Not Docket - 10/12/2016 Allocution where
             The Hit Man and Cooperating Witness stated under oath:
           - " No Financial of Any Gain for Kotlyarsky! "

**05/31/2017**

**Miscarriage of Justice**
**Sentenced on Hearsay**


A conspiracy between the Government and the Court against
innocent US citizen Boris Kotlyarsky was based on Hearsay.
Boris Kotlyarsky did a Noble Deed and **saved the life of US citizen**
**Oleg Mitnik. There was no fiancial gain or any gain for Kotlyarsky.**
The only gain was that he saved the life of Oleg Mitnik! The Court
**based it's decision on 100% hearsay, and not one piece of documented**
**evidence!**

**The Court:**

1. Page 17 - Lines 20-21: <u>**I don't have specific evidence before**</u>
   <u>**me to make express finding!**</u>

2. Page 17 - Lines 21-22: <u>**It seems to me**</u> it would been entirely
   reasonable to expect!

3. Page 17 - Lines 23-24: <u>**More likely than not that you did expect**</u>

4. Page 18 - Lines 1-3: <u>**I understand there s been no express**</u>
   testimony or evidence that you and Nayfeld had a specific
   discussion or understanding!
   (10/12/2016 Nayfeld testifies under oath as the Government Witness.
   The Government hid his testimony by sealing - no docket from
   the Court and the defence.)

5. Page 18 - Lines 3-4: But I do think the logic of this situation
   is such that, that was your intent and expectation.
   (Again the Government **hid by sealing** 10/12/2016 the testimony
   of Mr. Nayfeld which supported the innocence of Mr. Kotlyarsky.)

6. Page 18 - Lines 5-10: On more then one occasion you discussed
   with the victim the possibility of your doing business.
   (Since when did a 100% legal business conversation between friends
   become a crime?)

05/31/2017
Miscarriage of Justice
Sentenced on Hearsay


7. Page 18 – Lines 13-16:  **So even assuming for the sake of discussion.**

8. Page 18 - Lines 13-16:  I do think and I find that you did it in part, out of the view that **you would** and could benefit economically from that intervention.
(The Court was proven 100% wrong)
**The Victim: No financial gain or any gain, except saving the Victim's life!**
**The Government Witness:  No financial gain for Mr. Kotlyarsky!**
So much for what the Court thought and found out!
From Where?

9. Page 18 – Lines 17-19:  It is quite clear that you did in fact obstruct justice in this case?!

10. Page 18 - Line 23: You did obstruct justice?!

11. Page 19 – Line 3: Now, all of that said, it is the judgement of this court imprisonment of 41 months.

**There is documented evidence to support the innocence of Mr. Kotlyarsky!**
**To support the lack of knowledge by the Court!**
**To support that the statements by the Court were incorrect!**
**The Victim and the Government Witness's testimony supports the innocence of Mr. Kotlyarsky!**
**The Indictment and the Sentence are based on hearsay by the Government and the Court!**

000160

<u>The Sentencing</u>
<u>05/31/2017</u>
<u>The Court</u>


<u>Conclusions made by The Court of Mr. Kotlyarsky's guilt.</u>
<u>#1 through #19 = The Court's conclusions!</u>

1. – No evidence before the court to make express finding

2. – <u>It seems to me!?</u>

3. – More likely then not?!

4. – No express testimony or evidence!

5. – I do think the logic of this situation that was your intent
   and expectation – <u>100% incorrect!</u>

6. – On more then one occasion you discussed with the victim
   the possibility of your doing business.
   (Is this the Court's criminal accusation to discuss with a
   friend 100% legal business?)

7. – So even assuming for the sake of discussion
   (There is the life of US citizen – assuming and not on
   documented evidence!)

8. – I do think, I find that you did it in part, out of view
   that you <u>would</u> and could benefit economically!
   (<u>Incorrect!  No financial or any gain for the defendant!</u>)

9. – It is quite clear that you did in fact obstruct justice
   (100% incorrect – (10/12/2016 – The Government Witness)

10. – You did obstruct justice – The same as #9

11. – Now, all of that said – Judgement of 41 months
   (No Documented Evidence – 100% Hearsay!)

05-31-2017 - Sentencing
Prosecutional Misconduct!

12.        - Page 7 - Lines 5-7 - To cut to the chase at point in time
           although there had been discussion (3.5 hours of tape
           recording by Nayfeld)  Of Potik putting out a contract
           with Nayfeld (10/12/2016) to kill the Victim.  The deal
           hadn't been made between Potik and Nayfeld (Because of
           Kotlyarsky's intervention 01/11/2016)—Right answer by
           Entin ESQ!  Page 7 - Line 9  Entin ESQ:  That's Correct
           Wrong !

13. Wrong  - The notion all along was that once a contract was put
    Wrong    out to do the Hit (Not Extortion), your client basically
    Wrong    thought that he might be able to negotiate a situation
    Wrong    where the Victim could overbid Potik and thus buy off
    Wrong    the contract.
    Wrong    Page 7 - Line 14 - Entin ESQ:  Effectively Your Honor
    Wrong    Correct!
             Page 7 - Line 15 - The Court:  I get the picture!! (Wrong)
             01/08/2016 - Record!  Potik and Nayfeld agreed that
             Potik will pay Nayfeld - $250,000!  Nayfeld told Mitnik
             that information provided by Nayfeld.  The tape record
             provided by Nayfeld of The Murder Plot and if Nayfeld
             would be a witness for the FBI.  This would cost Mitnik
             $125,000 not $250,000.  Therefor overbid is incorrect!

14.          Page 22 - Lines 1-2: The Government notes for the record
             that it does not seek restitution or forfeiture! How Come?
             The Fact:  There was no conspiracy to Extort.  There was
             no Extortion!  100% Evidence there was a Murder for Hire
             that the Government replaced with Extortion to protect the
             identity of their confidential informant Anatoly Potik!

000162

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                            Case No. 16-cr-215 (LAK)

BORIS KOTLYARSKY,

    Defendant.

DECLARATION OF OLEG MITNIK

I, Oleg Mitnik, declare under penalty of perjury pursuant to 28 USC § 1746 that the following statements are true and correct to the best of my knowledge and belief.

1.    I make this declaration in support of Mr. Kotlyarsky's motion for a sentence reduction.

2.    As the purported victim of the murder plot, I am familiar with many of the relevant fact of this case.

3.    I was recently contacted by Mr. Kotlyarsky's attorney for purposes of providing this Declaration.

4.    Before signing this Declaration, I reviewed records of this case, including transcripts of Mr. Kotlyarsky's plea allocution and sentencing, and excerpts of his Presentence Report (PSR).

5.    Based on those records and my knowledge of certain facts, I believe Mr. Kotlyarsky's sentence was based on a misapprehension of material facts.

000163

6.   As such, I provide this Declaration to clarify the following relevant facts from my first-hand knowledge.

7.   After Mr. Kotlyarsky informed me of the murder plot, it was my idea, not his, for me to meet with the hit man, Boris Nayfeld. I asked Mr. Kotlyarsky, not the other way around, if he could arrange for a meeting between Mr. Nayfeld and me. I believe my initiating this request was recorded on a recording device provided to me by Special Agent Luke Hardison for the 12/3/2015 meeting between Mr. Kotlyarsky and me.

8.   From the onset (around late October 2015), Mr. Kotlyarsky told me that I should go to the police to get them involved. In early November 2015, I filed a complaint with my neighborhood police department. In mid-November 2015, my complaint was forwarded to an organized crime task force. Shortly thereafter, I met with federal authorities.

9.   At no point did Mr. Kotlyarsky ever ask me or lead me to believe that he expected in any way to be compensated financially for telling me about the murder plot, for arranging for the meeting with Mr. Nayfeld, or for his efforts in helping to save my life.

10.  Although Mr. Kotlyarsky and I did have a conversation about business, it was a casual conversation, the type that any two business men may have, who have long been friends, are catching up after a time of absence, and who think well of and wish well for each other. The conversation was unequivocally disconnected from anything to do with the murder plot. Mr. Kotlyarsky was not a stranger to me. We have known each other for many years, and were from the same country, Russia.

11.  In the sentencing of Mr. Kotlyarsky, the prosecutor stated that "not only was [Mr. Kotlyarsky's] intervention not the reason [I am] safe, but in intervening at all, Mr. Kotlyarsky made it worse and, in fact, risked

000164

greater harm. See Sentencing Transcript, p. 13. As the victim, I can state unequivocally that this statement could not be further from the truth. I fully believe that but for Mr. Kotlyarsky's intervention, I would not be alive today. Contrary to the prosecutor's contention, Mr. Kotlyarsky did not take "advantage of [my] specific fear of death", Id., but rather, he helped prevent my death.

12. The Court, after hearing the prosecutor's statements, concluded that "in one way or another, there would be an economic benefit to [Mr. Kotlyarsky] no matter how it turned out". Id, p. 17. Most respectfully, as the intended victim, as the person conversing with Mr. Kotlyarsky at that time, I do not see it that way. Mr. Kotlyarsky could have easily asked me for compensation given what he did, but he did not.

13. From what I understand, the government presented no evidence from Mr. Nayfeld demonstrating any agreement between Mr. Kotlyarsky and Mr. Nayfeld in which Mr. Kotlyarsky would receive a portion of what I paid Mr. Nayfeld. Indeed, my understanding is that the Government stated there was no financial gain for Mr. Kotlyarsky from Mr. Nayfeld.

14. To me that speaks volumes, given that Mr. Nayfeld entered a cooperative agreement with the government, requiring him to fully disclose the crime and answer all questions.

15. As such, there was no expectation of financial gain for Mr. Kotlyarsky from me, and no evidence of any financial gain for Mr. Kotlyarsky from Mr. Nayfeld. The Court's conclusion was thus completely unfounded and in diametrically opposed to the truth of what happened.

16. While I understand that Mr. Kotlyarsky pled guilty in a plea bargain, as I've stated before, I do not believe that Mr. Kotlyarsky should have been charged with extortion in the first place. I stated so at the time of

his arrest, and my feelings on the matter have not changed. I told this to the Probation Officer who noted my statement in Mr. Kotlyarsky's PSR. See PSR, Victim Impact.

17. It is my concerted feeling that Mr. Kotlyarsky's conviction and imprisonment, given the truth of what I know happened, and given probable outcome had he not intervened, constitutes a gross miscarriage of justice.

18. And just as disturbing to me is the severely disproportionate sentence imposed upon Mr. Kotlyarsky for his plea, compared to that of the mobster hit man, Mr. Nayfeld, and the mastermind financier of the murder plot, Mr. Potik.

19. Mr. Kotlyarsky, who saved my life, received a sentence of 41 months. In comparison, despite entering into a contract to murder me and subsequently extorting money from me to stave off the murder, Mr. Nayfeld was sentence by Judge Forrest to a mere 23 months. And despite conceiving, financing and setting in motion a murder plot against me, Mr. Potik somehow manipulated the government to enter a a *nolle prosequi*!

20. As a result, Mr. Kotlyarsky, whose intervention foiled the murder plot and saved my life, received a sentence nearly twice that of the hit man who intended to murder me, and the person who originally plotted and paid my murder walks away scot-free.

21. Nothing could more closely constitute a gross miscarriage of justice to Mr. Kotlyarsky.

22. I repeat what I told the Probation Department. I do not believe that Mr. Kotlyarsky should ever have been charged with extortion in this case, and most certainly, at the age of 70, he should not have to serve 41 months of imprisonment, even if he did accept a plea bargain for

000166

reasons personal to him.

23. In the hopes that justice and sensibility may gain the upper hand in this case, I submit this Declaration in support of Mr. Kotlyarsky's motion.

24. I implore the Court to grant the relief requested by Mr. Kotlyarsky, and any other relief that may be just, fair and equitable.

By _____

Oleg Mitnik

State of NY
County of New York

Affirmed before me this 14th day of December 2017.

_____
Notary Public

MICHAEL BENZ
Notary Public - State of New York
No. 01BE6114632
Qualified in New York County
My Comm. Expires Aug. 30, 2020

FROM BORIS KOTLYARSKY
1900 E 22 STREET
Brooklyn, N.Y. 11229
DOCKET No 22-2750
PRO-SE
(917) 969-9984



Retail

UNITED STATES
POSTAL SERVICE ®

10007

RDC 01

U.S. POSTAGE PAID
PM
BROOKLYN, NY 1122
AUG 26, 2023

$29.20

R2305K143268-03

9589 0710 5270 1062 6300 58

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL



9589 0710 5270 1062 6300 58



PRIORITY
★ MAIL ★

TRACKED
★ ★ ★
INSURED
★

UNITED STATES
POSTAL SERVICE ®

For Domestic and International Use    Label 107R, May 2014